BLANK ROME LLP
Proposed Attorneys for Debtor
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 885-5000
Michael Z. Brownstein (MB-9379)
Joel C. Shapiro (JC – 7291)
Rocco A. Cavaliere (RC-8686)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
In re:                                                     :
                                                           :
CHIYODA AMERICA INC.,                                      :  Case No. 09-_____ (___)
                                                           :  Chapter 11 Case
            Debtor.                                        :
---------------------------------------------------------- x

**MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO
BANKRUPTCY CODE SECTIONS 105, 361, 362, 363 AND 364 (I)
AUTHORIZING SECURED POST-PETITION FINANCING ON A
SUPERPRIORITY BASIS; (II) APPROVING AGREEMENTS RELATED TO
THE FOREGOING; (III) MODIFYING AUTOMATIC STAY;
AND (IV) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Chiyoda America Inc. ("Chiyoda"), as debtor and debtor in possession (the "Debtor") in this chapter 11 case, respectfully represents:

**CONCISE STATEMENT OF RELIEF REQUESTED**

1. By this Motion, the Debtor requests, among other things, the Court's entry of an order under sections 105, 361, 362, 364(c) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"): (a) authorizing the Debtor to enter into a debtor in possession financing agreement substantially similar to the form of DIP Loan Agreement attached hereto as **Exhibit A** (the "DIP Loan Agreement"); (b) authorizing

the Debtor to borrow money, incur indebtedness and perform its obligations in accordance with and subject to the terms of the DIP Loan Agreement, the interim order authorizing debtor in possession financing (a copy of which proposed order is attached hereto as **Exhibit B**, the "Interim Order"), the Final Order (as defined herein), and all agreements, documents, notes and instruments delivered pursuant hereto or thereto or in connection herewith or therewith (collectively, together with the DIP Loan Agreement, Interim Order and Final Order, the "DIP Financing Documents"); (c) approving the DIP Loan Agreement and other DIP Financing Documents, which may amend or modify the terms of the form of DIP Loan Agreement attached hereto without further order of this Court, except for (i) any increase in the aggregate of the DIP Lender's lending commitments, (ii) any increase in the fees or applicable interest rates on the promissory note executed and delivered in accordance with the terms of the DIP Loan Agreement (the "DIP Note"), other than increases described in the Motion, (iii) any modification of the maturity of the DIP Note or (iv) any other modification that imposes any additional material burden on the Debtor.

2.  The material provisions of the DIP Loan Agreement are as follows:

    (a)  Subject to the terms and conditions set forth in the DIP Loan Agreement, the DIP Lender commits that it will make one or more advances in the aggregate principal amount of $1,675,000 to the Debtor, at any time and from time to time until the earliest of: (i) December 15, 2009, or (ii) the Effective Date of the Debtor's Plan[1] (the "Maturity Date") (DIP Loan Agreement at § 2.1(a) and (b));

    (b)  The unpaid principal balance of the outstanding DIP Loan from time to time (together with all accrued but unpaid interest thereon) shall bear fixed interest at 0.83% per annum, calculated on the basis of 360-day year and actual days elapsed (DIP Loan Agreement at § 2.1(e));

---

[1] Capitalized terms that are not defined herein shall have the meanings ascribed to them in the Final Order and/or the DIP Loan Agreement.

(c) Except as otherwise provided in the DIP Loan Agreement, all outstanding principal and interest with respect to the DIP Loan shall be due and payable in full on (i) December 15, 2009 or (ii) the Effective Date of the Plan (DIP Loan Agreement at § 2.2(a));

(d) The DIP Loan will be secured by a security interest in all of the Debtor's assets, whether now owned or later acquired by the Debtor (collectively, the "Collateral"). The DIP Lender's security interest in the Collateral shall have a priority superior to the claims of all creditors of the Debtor, whether secured, unsecured, priority or administrative, pursuant to Bankruptcy Code § 364(c)(1), (c)(3), and (d)(1) (with respect to any pre-existing undisclosed security interests and the security interest in personal property in respect of the CGC Claim addressed in Class 3 of the Plan); provided, however, that such security interest in Real Estate Collateral (defined below) shall be junior to the security interest in respect of the liens for the Real Estate Tax Claim (defined below), the CGC Claim addressed in Class 3 of the Plan, and the Labor Department Claim and the Carve-Out Fees (DIP Loan Agreement at §§ 4.1 and 4.2); and

(e) The DIP Loan Agreement shall become effective upon the satisfaction of certain conditions including, but not limited to, the entry by this Court of the Interim Order. (DIP Loan Agreement at § 3.1(e).)

(f) The DIP Lender shall not be required to make any advances under the DIP Loan Agreement unless certain conditions are satisfied including, but not limited to, the entry on or before September 30, 2009, by this Court of a final order authorizing the DIP Facility (DIP Loan Agreement at § 7.1).

3. The Interim DIP Order and Final DIP Order further provide for:

(a) Adequate protection on account of any diminution in value of the Prepetition Collateral (as defined herein) in favor of the Prepetition Lender to the extent of the outstanding prepetition indebtedness owed to the Prepetition Lender in the form of Adequate Protection Liens subordinate only to the DIP Liens, Carve-Out Expenses and the Specified Permitted Liens and a superpriority claim with priority over all administrative expense claims and unsecured claims subordinate only to the DIP Superpriority Claim and the Carve-Out Expenses (Interim DIP Order at ¶¶ 9-11; Final DIP Order at ¶¶ 9-11);

(b) A determination of the validity, enforceability, priority, and amount of the Prepetition Liens and Prepetition Obligations (Interim DIP Order at ¶ E(v); Final DIP Order at ¶ F(v));

(c) Relief from the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility Documents, the Interim Order and the Final Order (Interim DIP Order at ¶14; Final DIP Order at ¶14);

(d) Automatic perfection of the DIP Liens and the Adequate Protection Liens (Interim DIP Order at ¶15; Final DIP Order at ¶15);

(e) A stipulation by the Debtor, among other things, that the Debtor and its estate have no offsets, defenses, claims, objections, challenges, causes of actions, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, and/or claims for equitable subordination, recharacterization or substantive consolidation, against the Prepetition Lender, and/or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees, and that the Debtor has waived, discharged and released any such rights (Interim DIP Order at ¶ E(v); Final DIP Order at ¶ F(v));

(f) A reservation of the rights of any Statutory Committee (and, solely if no Statutory Committee shall be appointed, any other party in interest other than the Debtor) during the Challenge Period to seek to object to or challenge the findings in the Final Order, including, but not limited to, those in relation to: (a) the validity, extent, perfection or priority of the mortgage, security interests and liens of the Prepetition Lender in and on the Prepetition Collateral, (b) the validity, allowability, amount, priority, status or size of the Prepetition Obligations, or (c) recharacterization, subordination, or substantive consolidation (each such objection or challenge, a "Challenge"). If no Challenge is raised in accordance with the Final Order during the Challenge Period, then all such Challenges shall be forever waived, released, barred and discharged for all purposes in connection with the Case and any Successor Case, and the Prepetition Obligations shall be allowed as claims in full, and shall be allowed as secured claims within the meaning of section 506 of the Bankruptcy Code to the extent of the value of the Prepetition Liens on the Prepetition Collateral on the Petition Date (Interim DIP Order at ¶ 31; Final DIP Order at ¶ 31);

(g) Indemnification by the Debtor in favor of the DIP Lender and its shareholders, directors, agents, officers, subsidiaries and affiliates, successors and assigns, and professional advisors from and against any and all claims, actions and suits, and from and against any and all liabilities, losses, damages and reasonable expenses of every nature and character arising out of the DIP Facility Documents, or related to the DIP Facility or the transactions contemplated thereby, the Interim Order or the Final Order, except to the extent that such liabilities, losses, damages or expenses arise out of such person's gross negligence or willful misconduct (Interim DIP Order at ¶ 23; Final DIP Order at ¶ 23);

(h) That no costs or expenses of administration that have been or may be incurred in the Case or any Successor Case at any time shall be charged against, and no person may seek to charge any costs or expenses of administration against, the DIP Lender, the Prepetition Lender, any of their respective claims, the DIP Collateral, the Prepetition Collateral, or any collateral subject to the Adequate Protection Liens, pursuant to sections 105, 506(c) or 522 of the Bankruptcy Code or otherwise, without the prior written consent, as applicable, of

the DIP Lender and/or the Prepetition Lender (Interim DIP Order at ¶ 33; Final DIP Order at ¶ 33); and

(i) Granting of a lien (as part of the DIP Collateral) on avoidance power claims or actions under section 549 of the Bankruptcy Code relating to post-petition transfers of DIP Collateral and any proceeds thereof, as well as the Debtor's rights under section 506(c) if the Bankruptcy Code and the proceeds thereof (but not the claims or the proceeds of any other claims or actions under Chapter 5 of the Bankruptcy Code) (Interim DIP Order at ¶ 5; Final DIP Order at ¶ 5).

## BACKGROUND

### General

4. On the date hereof (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court. The Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### The Debtor's Business

5. Chiyoda was organized in 1987 as a Pennsylvania corporation and is a wholly owned subsidiary of Chiyoda Gravure Corporation ("CGC" or "DIP Lender"), a Japanese corporation. Chiyoda manufacturers and distributes quality gravure printed products for sale to industrial customers located throughout the United States and Canada.

6. Chiyoda primarily prints for kitchen countertop and laminated floor manufacturers, kitchen and bath cabinet manufacturers and ready to assemble furniture makers. Chiyoda also acts as the distributor in the Western Hemisphere for the products manufactured by its European affiliate and CGC (and receives a commission on each sale).

7. Chiyoda has 68 employees (non-unionized). The gravure printing industry requires highly specialized equipment. Chiyoda believes its market share is approximately 15%; provided, however, such amount is highly volatile and fluctuates based upon home sales.

8. The causes which gave rise to the need to seek relief under Chapter 11 are numerous. First, commencing in 2002, a shareholder dispute erupted that caused many suppliers and customers to proceed in a fashion that did not maximize Chiyoda's abilities. The shareholder dispute was finally resolved by a confidential stipulation reached in a Tokyo court on May 30, 2008. Second, cheaper imports from China have caused a reduction in Chiyoda's market share. Third, several of Chiyoda's customers have had their own significant financial difficulties during the last eighteen months, which has resulted in a decrease of business and write-downs of accounts receivable. Lastly, the recent violent downturn in the building and real estate markets has had a significant impact on Chiyoda's operations.

9. As of June 30, 2009, Chiyoda's unaudited consolidated financial statement reflected assets totaling approximately $21,763,140 and liabilities totaling approximately $47,316,311.

## JURISDICTION

10. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 361, 362, 364(c) and 364(d) of the Bankruptcy Code.

## BASIS FOR RELIEF REQUESTED

### The Debtor's Prepetition Financing Needs

11.     Pursuant to that certain Loan Agreement dated as of June 29, 2007 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "June 2007 Loan Agreement" and together with all other loan and security documents executed in connection therewith, the "June 2007 Credit Documents"), among Cosmopolitan Graphics Corporation (now known as Chiyoda America Inc.), as borrower (the "Prepetition Borrower") and Chiyoda Gravure Corporation as lender (the "Prepetition Lender"), the Prepetition Lender provided credit to the Prepetition Borrower and provided other financial accommodations to or for the benefit of the Prepetition Borrower (collectively, the "June 2007 Financing"). The June 2007 Financing provided the Prepetition Borrower with 216,374,841 Yen (approximately $2.2 million) in aggregate principal amount of financing.

12.     To secure the Prepetition Borrower's obligations under and pursuant to the June 2007 Credit Documents, the Prepetition Borrower granted the Prepetition Lender security interests and liens (the "Prepetition Liens" (as further defined below)) in and on (a) all of its personal property, wherever located, then owned or thereafter acquired or arising, and the proceeds, products, rents and profits of all of the foregoing (the "Personal Property Collateral"), and (b) the real property owned by the Debtor commonly known as 378 Thousand Oaks Boulevard, Morgantown, Pennsylvania, and the fixtures thereon (the "Real Estate Collateral") (all of the foregoing collateral generally described in this paragraph F(ii), together with all of the proceeds, products, rents and profits, collectively the "Prepetition Collateral"). By the Security Agreement, dated as of June 29, 2007 (the

"June 2007 Security Agreement"), executed by the Prepetition Borrower in favor of the Prepetition Lender in connection with June 2007 Financing, the Prepetition Borrower granted the Prepetition Lender a first priority security interest in all of its personal property and assets to secure the prompt and complete payment, performance and observance when due of all indebtedness or liabilities of whatever kind, nature and description, then existing or thereafter arising, then due or to become due, of the Prepetition Borrower to the Prepetition Lender, whether direct or indirect, primary or secondary, secured or unsecured, absolute or contingent, joint or several, arising out of or relating to the June 2007 Loan Agreement or any other agreement, document, or instrument between or among the Prepetition Borrower and the Prepetition Lender. Other than expressly set forth in the following sentence, the Prepetition Liens are perfected and senior in priority to all security interests in and liens on the Prepetition Collateral, subordinated only to the Specified Permitted Liens (as defined in the Interim Order and the Final Order). The Prepetition Liens on the Real Estate Collateral are junior in priority to those certain liens relating to the real estate tax claims in the total amount of $237,812.69 of the Bureau of Berks County Pennsylvania (the "Real Estate Tax Claims") and senior in priority to the $23,000 claim of the Commonwealth of Pennsylvania, Department of Labor and Industry (the "Labor Department Claim").

13. Subsequent to the June 2007 Loan Agreement, the Prepetition Lender agreed to make additional loans and financial accommodations to the Prepetition Borrower (the "Additional Financing," and together with the June 2007 Financing, the

"Prepetition Financing").[2] Pursuant to the terms of the June 2007 Security Agreement, the Additional Financing is secured by security interests and liens in and on the Prepetition Collateral other than the Real Estate Collateral (such security interests and liens, together with the security interests and liens granted in connection with the June 2007 Financing, the "Prepetition Liens").

14. As of the Petition Date, the outstanding principal amount of all loans under the Prepetition Financing (exclusive of any amounts due under any equipment leases) was approximately $17,223,632 (collectively, together with any amounts paid, incurred or accrued in accordance with the Prepetition Financing documents, principal, accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses and disbursements), indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof, the "Prepetition Obligations").

15. Upon experiencing liquidity problems in June 2009, Chiyoda began to search for potential sources of alternative financing. Ultimately, the Debtor determined to proceed with the debtor-in-possession financing described herein.

### The Debtor's Postpetition Financing Needs

16. An immediate and critical need exists for the Debtor to obtain additional financing. Operating on use of cash collateral alone is not sufficient to fund all of the Debtor's critical needs. The most glaring shortfall of operating on cash collateral alone is that the Debtor cannot adequately fund its operating expenses and purchase additional

---

[2] The loan agreements pursuant to which the Additional Financing was extended (as amended, supplemented, restated or otherwise modified prior to the Petition Date), together with the June 2007 Loan Agreement, are hereinafter referred to as the "Prepetition Credit Agreements." The Prepetition Credit Agreements together with all other loan and security documents executed in connection therewith are hereinafter referred to as the "Prepetition Credit Documents."

A/73114487.2
132546.01400/21810123v.1

9

inventory. Without additional financing, the Debtor cannot fund its payroll expenses due on August 28, 2009, nor can it purchase new materials. As shown on the Budget attached hereto as **Exhibit C**, no purchase of new materials is anticipated until additional funding is obtained.

17. Moreover, the circumstances resulting in the commencement of this case is very likely to impact the Debtor's vendors' willingness to ship to the Debtor absent the approval of a postpetition financing facility. The sooner that vendor confidence is ensured, the more likely that the Debtor can successfully restructure and emerge from this proceeding.

18. The Debtor anticipates that the primary use of the funds to be made available under the DIP Loan Agreement (the "DIP Facility") will be for operating expenses and inventory purchases.

19. The DIP Lender is willing to provide the financing contemplated herein, subject to the terms and conditions set forth herein and in the DIP Financing Documents and the provisions of this Motion assuring that the DIP Indebtedness (as hereinafter defined) and the DIP Liens and various other claims, super-priority claims and protections pursuant to the DIP Financing Documents will not be affected by any subsequent reversal or modification of the Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangements contemplated by this Motion. The DIP Lender has acted in good faith in consenting to and in agreeing to provide the postpetition financing contemplated by this Motion and the other DIP Financing Documents and the reliance of the DIP Lender on the assurances referred to above is in good faith.

20. Under the DIP Facility, the Debtor will be entitled to borrow up to $1,675,000 on an incremental basis. The proceeds of the Interim Facility shall be used for the payment of operating expenses and the purchase of inventory.

### Good Cause

21. Among other things, approval of this Motion will minimize disruption of the Debtor's business and operations and permit it to obtain vital inventory and retain customer and supplier confidence by demonstrating an ability to maintain normal operations. The financing arrangements authorized hereunder are vital to avoid immediate and irreparable harm to the Debtor's estate. Consummation of such financing arrangement is therefore in the best interests of the Debtor's estate.

22. The financing and other arrangements for which authorization is sought have been negotiated in good faith and at arm's length among the Debtor and the DIP Lender and the terms of such financing arrangements are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

### Immediate Entry of Order

23. The Debtor requests immediate entry of the Interim Order pursuant to Bankruptcy Rule 4001(b) and (c). Bankruptcy Rule 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 may not be commenced earlier than 15 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.

24. The Debtor requests that the Court conduct an expedited preliminary hearing on the Motion and authorize the Debtor from and after the entry of the Interim Order until the Final Hearing to obtain interim credit under the DIP Loan Agreement. This will prevent immediate and irreparable harm to the Debtor and avoid prejudice to its estate and all parties in interest pending the Final Hearing by enabling the Debtor to maintain ongoing operations.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order (i) granting the relief requested herein and (ii) granting such relief as is just and proper.

Dated: New York, New York
August [19], 2009

By: */s/ Michael Z. Brownstein*
Michael Z. Brownstein
Joel C. Shapiro
Blank Rome LLP
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103-6998
(215) 569-5500
Facsimile: (215) 569-5555

Attorneys for Debtor