# EXHIBIT A

## DEBTOR-IN-POSSESSION LOAN AGREEMENT

This DEBTOR-IN-POSSESSION LOAN AGREEMENT (this "**Agreement**") is entered into as of August -__, 2009, by and among (i) Chiyoda America Inc., a Pennsylvania corporation (the "**Borrower**"), and (ii) Chiyoda Gravure Corporation, a Japanese corporation (the "**Lender**", together with the Borrower, the "**Parties**").

## RECITALS

A.        On August 19, 2009 (the "Petition Date"), the Borrower filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which commenced the bankruptcy case of the Borrower (the "**Chapter 11 Case**").

B.        The Borrower has requested that the Lender agree to make certain loans to the Borrower for the Borrower's operating and working capital purposes during the pendency of the Borrower's Chapter 11 Case.

C.        The Lender has agreed to make certain loans to the Borrower, subject to the terms and conditions set forth more fully in this Agreement.

Therefore, the parties acknowledge the receipt of sufficient consideration and agree as follows:

SECTION 1.  CONSTRUCTION AND DEFINITION OF TERMS.

**1.1        General Interpretive Principles**.  If the context requires, the use of a gender shall also refer to the other gender, and the use of the singular shall include the plural and vice versa. All terms which are defined by the Uniform Commercial Code as presently in effect in the State of the Commonwealth of Pennsylvania (the "**U.C.C.**") shall have the same meanings assigned to them by the U.C.C., unless (and to the extent) they are varied by this Agreement. All accounting terms not specifically defined shall have the meanings determined by reference to generally accepted accounting principles in the United States of America existing as of the date of this Agreement and applied on a basis consistent with those reflected by the financial statements ("**GAAP**").  The word "including" is not exclusive.  References to "dollars" or "$" mean United States dollars.

**1.2        Certain Definitions**.  In this Agreement:

"**Approved Budget**" means a budget for the Borrower setting forth, among other things, operating expenses for at least ninety days following the date of this Agreement, in form and substance approved by the Lender and updated from time to time as required by this Agreement.

"**Bankruptcy Code**" means 11 U.SC. §101 et. seq., as amended from time to time.

"**Business Day**" means any day other than a Saturday and Sunday or a day in which commercial banks in the city of New York, the State of Pennsylvania or the city of Tokyo are authorized or obligated by law or executive order to close.

"**Collateral**" is defined in Section 4.1.

"**Commitment**" means Lender's commitment to make the Loan in the maximum principal amount up to $1,675,000 in accordance with and pursuant to the DIP Commitment Letter dated as of August 17, 2009 made by the Lender to the Borrower (the "**DIP Commitment Letter**").

"**Condition Precedent**" is defined in Section 3.2.

"**Event of Default**" is defined in Section 7.1.

"**Final Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to the Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the Lender waives such requirement, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Lender, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur the Obligations, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of the Lender's claims.

"**Indebtedness**" is defined in Section 6.2(g).

"**Interim Order**" means the order of the Bankruptcy Court, in form and substance satisfactory to the Lender, entered in the Chapter 11 Case after an interim hearing, together with all extension, modifications, and amendments thereto, in form and substance satisfactory to the Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Lender to execute and perform under the terms of this Agreement and the other Loan Documents,

"**Lien**" means any statutory or common law consensual or non-consensual mortgage, pledge, security interest, encumbrance, lien, right of setoff, claim, or charge of any kind, and, in the case of real estate, any easement, right of way, condition, restriction, zoning ordinance or other matter affecting title to or use of the real estate. Liens include any conditional sale or other title retention transaction, any sale-leaseback transaction, and any transaction that is regarded as a secured transaction under the U.C.C.

"**Loan**" is defined in Section 2.1(a).

"**Loan Documents**" means this Agreement, the Note, Mortgage and Security Agreement and any and all other promissory notes, security agreements, assignments, subordination agreements, pledge or hypothecation agreements, mortgages, deeds of trust, leases, contracts, guaranties, and other instruments and documents now or hereafter existing that are executed or delivered in conjunction with this Agreement.

"**Loan Request**" is defined in Section 2.1(c).

"**Maturity Date**" means the earliest of: (i) December 15, 2009 or (ii) the Effective Date of the Plan as defined in the Plan.

"**Mortgage**" means that certain Mortgage and Security Agreement dated as of the date therewith to be given by the Borrower to the Lender referring to this Agreement.

"**Note**" means the promissory note made by the Borrower to the order of the Lender, in substantially the form of Exhibit A attached hereto dated as of the date therewith and all extensions, renewals, modifications and substitutions of (or for) such promissory note.

"**Obligations**" means all of the Borrower's present and future duties, covenants, responsibilities, liabilities, and other obligations to the Lender under this Agreement, the Note, or the other Loan Documents, including, without limitation costs and professional fees payable hereunder. Obligations also includes all other present and future obligations or liabilities of the Borrower to the Lender of any nature or description, whether secured or unsecured, liquidated or unliquidated, direct or indirect, absolute or contingent, matured or unmatured, joint, several, or joint and several, including obligations to perform acts or refrain from performing acts other than the payment of money, and including claims against the Borrower acquired by assignment to the Lender, whether or not secured under any other document, instrument, or statutory or common law provision. Obligations also includes all extensions, renewals, modifications, and substitutions of (or for) any of the foregoing.

"**Permitted Lien**" shall mean (i) purchase money mortgages or other purchase money Liens (including, without limitation, finance leases) upon any fixed or capital assets in existence on the Petition Date or Liens (including, without limitation, finance leases) on any such assets existing at the time of acquisition of such assets, whether or not assumed, so long as (w) any such Lien does not extend to or cover any other asset of the Borrower or any of its subsidiaries, (x) such Lien secured only the obligation to pay the purchase price of such asset (or the obligation under such finance lease) and (y) the principal amount secured by each such Lien does not exceed the unpaid purchase price for such asset; (ii) carriers' warehousemen's, mechanics', materialmen's repairmen's or other like Liens arising in the ordinary course of business and in existence on the Petition Date in the maximum amount of [$100,000]; (iii) pledges of deposits to secure obligations under workmen's compensation laws or similar legislation as of the Petition Date; (iv) deposits to secure public or statutory obligations of the Borrower or any of its subsidiaries as of the Petition Date; (v) deposits to secure surety, or customs in the ordinary course of business; (vi) zoning restrictions, licenses, easements, rights-of-way, restrictions on the use of real property or minor irregularities in title thereto and other similar charges or encumbrances not interfering with the ordinary conduct of the business of the Borrower or any of its subsidiaries and not impairing the value of the affected property; and (vii) the Liens for the Class 7 Secured Real Estate Tax Claims, Class 3 CGC Loan, and Class 9 Secured Claims of the Commonwealth of Pennsylvania as defined in the Plan.

"**Person**" means a human being, corporation, association, partnership, limited liability company, joint venture, trust, government, agency, department, or any other entity of any kind.

"**Plan**" means the Reorganization Plan of the Borrower in the Chapter 11 Case in form and substance acceptable to the Lender in its sole and absolute discretion.

"**Professional Fees Carve-Out**" means the obligations of the Borrower in respect of fees (i) incurred following the commencement of the Chapter 11 Case by professionals employed with approval of the Bankruptcy Court, and (ii) allowed by the Bankruptcy Court.

3

"**Receivables**" mean all of the following, whether owned now or acquired later: (i) accounts receivable of the Borrower and all related books and records, (ii) documents arising out of (or acquired in the ordinary course of) the Borrower's business, (iii) instruments arising out of (or acquired in the ordinary course of) the Borrower's business, (iv) chattel paper arising out of (or acquired in the ordinary course of) the Borrower's business, and (v) all other forms of payment obligations to Borrower arising out of (or acquired in the course of) the Borrower's business together with proceeds of all of the foregoing. Receivables include all Liens, guaranties, securities, rights, remedies, and privileges running to the benefit of the Borrower and pertaining to any of the foregoing.

"**Records**" means all books, records, ledger cards, and other property and general intangibles at any time evidencing or relating to any of the assets or operations of the Borrower or any of the Collateral.

"**Security Agreement**" means that certain Security Agreement dated as of the date hereof by and between the Borrower and the Lender referring to this Agreement.

SECTION 2.  LOAN.

**2.1  Loan**.

(a)  **Advances**.  Subject to the terms and conditions of this Agreement, upon the satisfaction of the conditions precedent set forth in Section 3, the Lender hereby commits that it will make one or more advances of the loan (collectively, the "**Loans**") to the Borrower, at any time and from time to time prior to the termination of the Commitment as provided herein. The Borrower shall not be entitled to receive any additional Loan after, and the Commitment will terminate automatically upon, the occurrence of the Maturity Date.

(b)  **Advance Limits**. The aggregate principal amount of the Loan outstanding at any given time shall not exceed $1,675,000.

(c)  **Loan Requests**.

(1)  Any Loan shall be funded subject to and upon the terms and conditions set forth in Section 3 hereof have been satisfied.

(2)  Each request by the Borrower for an advance under the Loan (a "**Loan Request**") shall be made in writing at least two Business Days before the day on which the Loan is to be made, in the manner and in the form prescribed by the Lender from time to time and shall include a requirement for the Borrower to affirm that all representations and warranties of the Borrower set forth in this Agreement continue to be true and correct in all material respects with the same effect as though such representations and warranties were made on the date of the making of the Loan, and that all Conditions Precedent to the requested Loan have been satisfied, as of the time the Loan Request is submitted to the Lender.

(3)  Each Loan Request shall be for a minimum of $10,000.

(d)     **Note.** The Borrower's obligation to repay the Loans shall be evidenced by the Note.

(e)     **Interest Rate.** Except as otherwise provided in this Agreement, the daily unpaid principal balance of the Note outstanding from time to time (together with all accrued but unpaid interest thereon) shall bear fixed interest at 0.83% per annum (the "Interest Rate") , calculated on the basis of 360 day year and actual days elapsed.

**2.2     Payments.**

(a)     **Payments.** Except as otherwise provided in the Loan Documents, all outstanding principal and interest with respect to the Loan shall be due and payable in full on the Maturity Date. Payments of principal of or interest on the Loans shall be made to the Lender not later than 3:00 p.m. on the date when due (Tokyo time) or after as the Lender may designate from time to time.

(b)     **Prepayments.** The Loan may be prepaid in whole or in part before the Maturity Date with the prior consent of the Lender with at least five Business Days' prior written notice which should be irrevocable. Such prepayment should be made in an amount of not less than $100,000 or multiple thereof. The Borrower shall pay all accrued interest on the principal amount prepaid.

(c)     **Mandatory Prepayments.**     The Loan shall be prepaid when the Borrower receives or collects any proceeds from the disposition of the Collateral to the extent of the proceeds when the disposition occurs out of the Borrower's ordinary course of business.

SECTION 3. CONDITIONS PRECEDENT.

**3.1     Conditions to Effectiveness.**  This Agreement shall become effective on the date that each of the following conditions has been satisfied:

(a)     receipt by the Lender of a Note executed by the Borrower in favor of the Lender;

(b)     execution of this Agreement by each of the Parties;

(c)     satisfaction or waiver by the Lender of the Conditions Precedent numbered 3.2(a), (b), (c), (d) and (h) to the extent that any condition exists that would constitute, or with notice and/or the passage of time would constitute, an Event of Default;

(d)     Receipt by the Lender of resolutions authorizing this Agreement, the filing of the Chapter 11 Case and the transactions and granting of liens and security interests contemplated herein;

(e)     Entry by the Bankruptcy Court of the Interim Order

**3.2     Conditions Precedent to Each Advance.** The Lender shall not be required to make any advance pursuant to this Agreement unless each of the following conditions precedent (each a "**Condition Precedent**") has been satisfied:

(a)     **Note and Loan Documents.** The Borrower shall execute and deliver to the Lender the Note and all other instruments or documents as are necessary or reasonably requested by the Lender to confirm the grant to the Lender of a security interest in the Collateral and to perfect such security interest with the priority provided in this Agreement.

(b)     **Consents.** All Persons whose consents are required in order to permit the Borrower to enter into and perform the terms of this Agreement shall have consented to such matters.

(c)     **Bankruptcy Court Order.** The Bankruptcy Court shall have entered the Final Order approving the terms of this Agreement on or before [September 30,] 2009, which Order shall be in form and substance satisfactory to the Lender in its sole discretion and shall provide (1) for liens securing the Obligations which liens shall be granted pursuant to Bankruptcy Code Sections 361, 362, 364(c)(2) 364(c)(3) and 364(d), (but otherwise subject to the terms of Section 4.2 below) and shall be continuing, valid, binding, enforceable and automatically perfected postpetition security interest and liens on all of the presently owned and hereinafter acquired assets of the Borrower, and (2) that the right to repayment of all outstanding monetary Obligations shall constitute a super priority administrative expense claim with priority under Bankruptcy Code §§ 364(c)(1), 503(b) and 507(b) over all administrative expense claims, except the Carve-Out Fees, and unsecured claims against Borrower and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code §§ 105, 326, 330 (except as otherwise provided in paragraph 4 below), 328, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114.

(d)     **No Default.** There shall exist no Event of Default and no condition, event, or act which, with notice or lapse of time, or both, would constitute an Event of Default.

(e)     **Representations and Warranties.** All representations and warranties contained in this Agreement (or otherwise made to the Lender in connection with this Agreement) shall be true and correct in all material respects with the same effect as through such representations and warranties were made on the date of the making of the Loan.

(f)     **Compliance with Covenants.** The Borrower shall be in full compliance with all of the covenants set forth in Section 6.

(g)     **Purpose of Loan.** The sole purpose of each Loan hereunder shall be to pay expenses incurred by the Borrower in the ordinary course of business in conformity with the Approved Budget.

(h)     **UCC Financing Statements and Mortgage.** The Borrower shall have delivered to the Lender all UCC-1 financing statements and the Mortgage required by the Security Agreement and the Mortgage and Security Agreement and all of such financing statements and the Mortgage shall have been duly filed and recorded in the appropriate jurisdictions.

(i) **Continuing Effect of Order of the Bankruptcy Court.** The Order shall be unmodified and remain in full force and effect.

(j) **Advance Limit**. The advance requested would not cause the aggregate outstanding amount of the Loans to exceed the amount then authorized by the Interim Order or the Final Order, as the case may be, or any order modifying, reversing, staying or vacating such order shall have been entered, or any appeal of such order shall have been timely filed.

(k) **Bankruptcy Orders**. All orders entered by the Bankruptcy Court on or prior to the entry of the Final Order shall be satisfactory in form and substance to the Lender,

SECTION 4. SECURITY.

**4.1 Grant of Security Interest in Collateral.** In order to induce the Lender to make the Loan to the Borrower, and in order to secure all of the Borrower's Obligations to the Lender, the Borrower hereby grants to the Lender a security interest in and Lien on all of the Borrower's assets, whether now owned or later acquired by the Borrower (collectively, the "**Collateral**"), pursuant to the Security Agreement and the Mortgage.

**4.2 Priority of Security Interest.** The Lender's security interest in the Collateral shall have a priority superior to the claims of all creditors of the Borrower, whether secured, unsecured, priority or administrative, pursuant to §§ 364(c)(1) and (c)(3), and (d)(1) (with respect to any pre-existing undisclosed security interests and the security interest in the personal properties for the Class 3 CGC Loan as defined in the Plan) of the Bankruptcy Code; provided, however, that such security interest in the real estate shall be junior to the security interest in respect of the Liens for the Class 7 Secured Real Estate Tax Claims, Class 3 of the CGC Loan and Class 9 Secured Claims of the Commonwealth of Pennsylvania, Department of Labor and Industry as defined in the Plan and the Carve-Out Fees.

**4.3 Continuing Interest.** The Borrower's obligations hereunder and the Lender's security interest in the Collateral shall continue to be valid as provided in the Loan Documents on any dismissal of the Chapter 11 Case or the conversion of the Chapter 11 Case into the Chapter 7 proceeding under the Bankruptcy Code.

SECTION 5. REPRESENTATIONS AND WARRANTIES.

In order to induce the Lender to enter into this Agreement, make the Loans, and accept the Note, the Borrower makes the following representations and warranties to the Lender:

**5.1 Organization.** The Borrower is duly organized, and validly existing under the laws of the Commonwealth of Pennsylvania and has the power and authority and all necessary governmental approvals to own, lease, and operate its properties and to carry on its business as it is now being conducted. The Borrower is duly qualified to do business and is in good standing in the Commonwealth of Pennsylvania and is authorized to do business in each jurisdiction where such authorization is necessary and have full power to transact business in which it is being engaged.

**5.2 Formal Action.** Subject to approval from the Bankruptcy Court, the Borrower has the corporate power and authority to execute and perform the Loan Documents. All corporate

actions necessary to authorize the execution, delivery and performance of the Loan Documents have been duly taken.

**5.3** **Intellectual Property**. The Borrower possesses or has the right to use all material patents, trademarks, service marks, trade names, copyrights, licenses and other rights, free from burdensome restrictions, that are reasonably necessary for the operation of its business as presently conducted.

SECTION 6. COVENANTS.

Until the Borrower has fully and indefeasibly paid the Note and fully and indefeasibly discharged all of the Obligations, the Borrower covenants and agrees as follows:

**6.1** **Corporate Matters**.

(a) **Corporate Status.** The Borrower shall maintain its existence and its corporate status in good standing under the laws of the State of Pennsylvania.

(b) **Dividends and Distributions on Account of Ownership of Stock.** The Borrower shall make no dividends or distribution of money or other property (whether from cash flow, proceeds of the sale, financing of assets or otherwise) to the holders of its stock, and shall not redeem or repurchase any of its stock.

(c) **Use of Loan Proceeds.** The Borrower shall use all proceeds of each Loan hereunder to pay expenses incurred by the Borrower in the ordinary course of business in conformity with the Approved Budget.

**6.2** **Matters Relating to the Conduct of Business**.

(a) **Continuation of Business and Compliance with Laws.** Except as otherwise required by the Bankruptcy Court or the Bankruptcy Code, the Borrower shall continue its business operations in the same manner and quality substantially as now being conducted, and comply with all applicable federal, state, and local laws, rules, ordinances, regulations, and orders.

(b) **Maintenance of Properties.** The Borrower shall maintain all tangible property included in the Collateral in good order and repair, subject to normal wear and tear, and make all needed and proper repairs to its properties so that the Borrower's business may be properly and advantageously conducted at all times in accordance with prudent business management and in compliance with all governmental requirements and regulations.

(c) **No Sale, Transfer or Other Disposition of the Assets.** The Borrower shall not sell, transfer or dispose of its assets other than in the ordinary course of business.

(d) **Insurance.** The Borrower will maintain all of its insurance policies that are in place as of the date hereof.

(e) **Loans.** The Borrower shall not make any loan to any Person.

(f)    **Capital Expenditures.** The Borrower shall neither make nor agree to make any capital expenditures without the prior written consent of the Lender.

(g)    **No Other Indebtedness.** The Borrower shall not incur any debt or other financing obligation in favor of any Person (any "**Indebtedness**"), except: (i) Indebtedness to the Lender under this Agreement; and (ii) trade accounts payable incurred in the ordinary course of the Borrower's business; and (iii) installments agreements for the payment of insurance premiums.

(h)    **No Other Liens.** The Borrower shall not provide any Person with any Liens to secure any Indebtedness.

(i)    **Inspection Rights.** The Borrower shall permit the Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom upon the request of the Lender.

(j)    **Updated Budget.** The Borrower shall provide the Lender with: (i) on [Wednesday of each week] with a cash flow report for the prior week; (ii) on or before the tenth day of each month an updated 90-day budget projection

SECTION 7. EVENTS OF DEFAULT; REMEDIES.

**7.1**    **Default.** Each of the following events shall constitute an event of default ("**Event of Default**") under this Agreement:

(a)    The failure of the Borrower to pay the principal of, or interest on, the Loan on the Maturity Date or when otherwise required under this Agreement.

(b)    The failure of the Borrower to perform any of its other material obligations under any of the Loan Documents when such performance is due and such failure shall continue unremedied for a period of five (5) Business Days after the Borrower has received written notice of such failure from the Lender.

(c)    The suspension or termination of the usual business of the Borrower

(d)    If any property of the Borrower, including the Collateral, is attached, levied upon, seized under authority of a court, or otherwise taken in satisfaction of a judgment against the Borrower in an amount in excess of $100,000.

(e)    If any representation or warranty made to the Lender by the Borrower in or pursuant to this Agreement or to induce the Lender to make any Loan contains an untrue statement of a material fact or omits to state any material fact necessary to make the statements made therein not misleading, at the time made or supplied.

(f)    The conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code.

(g)    The dismissal of the Chapter 11 Case.

(h)     The appointment of a trustee for the Borrower (either under Chapter 11 or Chapter 7 of the Bankruptcy Code).

(i)     The expiration, modification or revocation of the Order.

(j)     The failure of the Bankruptcy Court to enter the Order in form and substance reasonably satisfactory to the Lender on or before September 30, 2009.

(k)     The failure by the Borrower to observe or perform the terms of the Order.

(l)     The failure of the Bankruptcy Court to enter the order confirming the Plan in form and substance reasonably satisfactory to the Lender on or before November 30, 2009.

**7.2     Termination of Commitment; Default Interest.**   Except as otherwise provided herein, upon the occurrence of an Event of Default, the Lender, with prior notice to the Borrower, may terminate the Commitment.   Upon the occurrence of an Event of Default, without notice or demand, the daily outstanding principal amount of the Note and all accrued but unpaid interest thereon shall bear interest at 1.0% above the Interest Rate until paid in full.

**7.3     Modification of Automatic Stay.**   The automatic stay imposed by virtue of §362 of the Bankruptcy Code shall be modified to provide that upon the occurrence of an Event of Default and the expiration of any applicable cure periods, the Lender may at its option proceed with any rights or remedies that may be available to it under this Loan Agreement or any other Loan Documents or otherwise.

**7.4     Acceleration.**   Upon the occurrence of an Event of Default, (i) the Lender may declare the Note immediately due and payable, whereupon the Note shall be due and payable, and (ii) the Lender may declare all other monetary Obligations immediately due and payable, whereupon they shall be due and payable.

**7.5    Collection of Receivables after Event of Default.**

(a)    **Collection.** After repayment in full of the loans secured by the senior Permitted Liens and after the Borrower's authority to collect the Receivables is terminated (which the Lender may do in its sole discretion at any time after an Event of Default has occurred, subject to the provisions of Section 7.3), the Lender shall have the right to send notices of assignment (and notices of the Lender's security interest) to any customers whose accounts are included in the Receivables. Thereafter, the Lender shall have the sole right to collect the Receivables and to take possession of all Records relating to the Receivables; provided, however that, upon the Borrower's request, Lender shall make such Records available to Borrower for inspection or otherwise allow the Borrower to copy such Records. Any and all of the collection expenses, including stationery and postage, telephone and internet, secretarial and clerical expenses, and the salaries of any collection personnel used, shall be charged to the Borrower, shall be payable on demand and shall be added to the Obligations. Once all of the outstanding monetary Obligations have been fully and indefeasibly paid, the Lender's right to collect Receivables and possess Records related thereto shall terminate and such right shall revert to the Borrower.

(b)    **Endorsements, Power of Attorney.** After the Borrower's authority to collect the Receivables is terminated and, subject to the repayment of the loans secured by the senior Permitted Liens, the Lender shall have the right to receive, indorse, assign, and deliver in its name (or the name of the Borrower) any and all checks, drafts, and other instruments for the payment of money relating to the Receivables. In that event, (A) the Borrower waives notice of presentment, protest, and non-payment of any instrument so indorsed, and (B) the Borrower hereby appoints the Lender as the Borrower's attorney-in-fact with power (i) to indorse the Borrower's name on any notes, acceptances, checks, drafts, money orders, or other evidences of payment that may come into the Lender's possession, (ii) to sign the Borrower's names on any invoice relating to the Receivables and notices to customers, (iii) to notify post office authorities to change the address for delivery of mail addressed to the Borrower to any address designated by the Lender, and (iv) to do all other acts necessary to carry out this Agreement. The Lender shall not be liable for any acts of commission or omission, or for any error of judgment or mistake of fact or law, except for willful misconduct. This power of attorney is coupled with an interest and is irrevocable while any Obligation remains unpaid. After the Borrower's authority to collect the Receivables is terminated, the Lender, without notice to or consent from the Borrower, but subject to the repayment of the loans secured by the senior Permitted Liens, may sue upon or otherwise collect, extend the time of payment of, or compromise or settle for cash, credit, or otherwise upon any terms, any of the Receivables, all without discharging any Obligations of the Borrower.

(c)    **No Agency.** Nothing in this Agreement shall be construed to constitute the Lender as agent of the Borrower or constitute the Borrower the agent of the Lender for any purpose whatsoever.

**7.6    Application of Proceeds.** Upon the occurrence and during the continuance of an Event of Default, the proceeds of any sale of, or other realization upon, all or any party of the Collateral, shall be applied by the Lender first to any fees, second to all interest and third to all principal due pursuant to the Loan Documents.

**7.7    Other Remedies Provided by Law.**  Subject to the provisions of Section 7.3, upon the occurrence of an Event of Default, the Lender shall be entitled to all other remedies provided by law and in equity, in addition to the remedies set forth in this Agreement and the other Loan Documents.

**7.8    Costs of Enforcement.**  If an Event of Default occurs, whether or not the Lender pursues any of the remedies set forth in this Agreement or the other Loan Documents, the Borrower shall be responsible for (and shall pay on demand) all costs incurred by the Lender in protecting or enforcing its rights, including reasonable attorneys' fees.

**7.9    Relationship of the Parties.**  This Agreement provides for the making of the Loans by the Lender, in its capacity as a lender, to the Borrower, in its capacity as a borrower, and for the payment of interest and repayment of principal by the Borrower to the Lender. The relationship between the Lender and the Borrower is limited to that of creditor/secured party/mortgagee, on the one hand, and borrower/grantor/mortgagor, on the other hand. The Borrower acknowledges that it has had the opportunity to obtain the advice of experienced counsel of its own choosing in connection with the negotiation and execution of this Agreement and to obtain the advice of such counsel with respect to all matters contained herein. The Borrower further acknowledges that it is experienced with respect to financial and credit matters and has made its own independent decision to apply to the Lender for credit and to execute and deliver this Agreement.

SECTION 8.  MISCELLANEOUS.

**8.1    Governing Law.**  This Agreement and the Note shall be governed by the laws of the State of New York without giving effect to the conflict of laws provisions other than the U.C.C.

**8.2    Entire Agreement.**  This Agreement and the other Loan Documents embody the entire agreement of the parties thereto with respect to their subject matter.  There are no restrictions, promises, representations, warranties, covenants, or undertakings other than those expressly set forth or referred to herein and therein.  This Agreement and the other Loan Documents supersede all prior agreements and understandings between the parties with respect to their subject matter.

**8.3    Amendment.**  This Agreement may be amended only in a writing signed by all of the parties thereto.

**8.4    No Waiver.**  No waiver shall be effective against any party unless it is in a writing signed by that party.  No waiver by the Lender of any specific breach of any term or covenant contained in any of the Loan Documents shall operate as a general waiver of the term or covenant, or of any specific subsequent breach.  Except as specifically provided in this Agreement, the Borrower shall have no right to cure any Event of Default.  If, however, the Lender accepts performance from the Borrower, and if, with the express written consent of the Lender, the performance cures the Event of Default, then the Lender shall have waived the right to exercise its remedies with respect to that Event of Default.  The Lender shall not have waived its right to exercise its remedies with respect to any other (or any subsequent) Event of Default.

**8.5    Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  Any signature page delivered by facsimile or as an attachment to an electronic mail

message in ".pdf" or similar format shall be binding to the same extent as an original signature page with regard to any agreement subject to the terms hereof or any amendment thereto.

**8.6     Cumulation of Rights and Remedies.** No right or remedy of the Lender under any of the Loan Documents is intended to preclude any other right or remedy contained in any of the Loan Documents or in any document delivered in connection with (or pursuant to) any of the Loan Documents. Every right and remedy shall coexist with every other right and remedy now or hereafter existing, whether by contract, at law, or in equity.

**8.7     Successors and Assigns.** This Agreement shall inure to the benefit of and be binding upon the parties and their successors and assigns and upon any trustee appointed for the Borrower in connection with the Chapter 11 Case. Except for an assignment by Borrower to the Buyer in connection with the Sale, the Borrower shall have no right to assign any of its rights or delegate any of its Obligations under this Agreement without the prior written consent of the Lender. There shall be no restrictions of any nature on the Lender's right to assign its rights under this Agreement.

**8.8     Notices.** All notices, demands, requests, consents, approvals or other communications required or permitted to be given with respect to this Agreement shall be in writing and shall be delivered (charges prepaid, receipt confirmed or return receipt requested (if available)) by hand, by nationally recognized air courier service or by facsimile, addressed as set forth below or to such other address as such Person shall have specified most recently by written notice.  Notice shall be deemed given and effective (i) if delivered by hand or by nationally recognized air courier service, when delivered at the address specified in this Section 8.8 (or in accordance with the latest unrevoked written direction from such Person) or (ii) if given by facsimile when such facsimile is transmitted to the facsimile number specified in this Section 8.8 (or in accordance with the latest unrevoked written direction from such Person), provided that appropriate confirmation is received and that any such facsimile is promptly followed by delivery of written notice by hand or by nationally recognized air courier service.

If to the Borrower:

Chiyoda America, Inc.
708 Third Avenue, 5th Floor,
Suite 97, New York,
New York 10017
Attn: Hiroshi Mizumoto

With a Copy to:

Blank and Rome LLP.
One Logan Square,
18th & Cherry Streets
Philadelphia, PA, 19103-6998
Attn: Joel C. Shapiro, Esq.
Fax No.: (215) 832-5746

If to Lender:

With Copies to:

Chiyoda Gravure
Corporation
1-18-16 Osaki,
Shinagawa-ku, Tokyo
141-0032, Japan
Attn: Chikara Suzuki
Fax No: +81-3-3492-5311

Bingham McCutchen LLP
399 Park Avenue,
New York, NY, 10022-4689
Attn: Fumiaki Mizuki, Esq.
Fax No.: (212) 508-1402

**8.9    Waiver of Certain Defenses.** Regardless of consideration, and without notice to or consent by the holder of any subordinate security interest in the Collateral, the Lender may (i) release the Obligations, (ii) release any Person liable for any of the Obligations, (iii) release any part of the security held for the Obligations, (iv) extend the time of payment, or (v) otherwise modify the terms of any of the Loan Documents, without in any way affecting the existence or priority of the Liens created by the Loan Documents. The Lender may resort for the payment of the Obligations to the Collateral held by the Lender in any order and manner it chooses.

**8.10    Headings.** The headings in this Agreement are intended solely for convenience of reference. They shall be given no effect in the construction or interpretation of this Agreement.

**8.11    Severability.** The invalidity or unenforceability of any provision of this Agreement shall not impair the validity or enforceability of any other provision.

**8.12    Jurisdiction.** The Bankruptcy Court shall have exclusive jurisdiction over any dispute, claim or controversy arising out of or related to this Agreement, and each party hereto (A) irrevocably submits to the jurisdiction of the Bankruptcy Court, (B) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court, (C) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any party, and (D) agrees that service of process upon such party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement; *provided, however,* that to the extent that the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then the United States District Court for the Southern District of New York and state courts sitting in the New York county shall have such jurisdiction, and each party submits thereto and waives the objections described above with respect thereto.

**8.13    Right to Perform.** If the Borrower fails to perform timely any of its Obligations under any of the Loan Documents, the Lender shall have the right (but not the obligation) to perform them. The Lender's performance shall be for the account of the Borrower and at the Borrower's expense and risk.

**8.14    Expenses to Protect the Lender's Rights.** If the Lender incurs or spends any amounts (including attorneys' fees) to sustain the existence and priority of the Liens created by the Loan Documents, or to perform any of the Borrower's obligations under any of the Loan Documents, or to collect any amounts due under any of the Loan Documents, all such amounts, together with interest from the date the amount is advanced until the date it is repaid, at the rate set forth in the

Note, shall be included in the Obligations, and shall be repaid by the Borrower to the Lender on demand.

**8.15** **Indemnity.** The Borrower hereby agrees to indemnify and hold harmless the Lender and each of the Lender's shareholders, directors, officers, employees, agents, attorneys and representatives of each of them (each, an "Indemnified Person") from and against all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including, but not limited to, reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal), which may be instituted or asserted against or incurred by any such Indemnified Person in connection with, or arising out of, this Agreement, the DIP Commitment Letter which is submitted by the Lender regarding this Agreement; provided, however, that such indemnification shall not include any acts of the Lender which are determined by a court of competent jurisdiction to constitute gross negligence or willful misconduct and shall not include any prepetition acts or omissions that are not related to the DIP financing. Under no circumstances will an Indemnified Person be liable to the Borrower for any punitive, exemplary, consequential or indirect damages which may be alleged in connection with this Agreement, the DIP Commitment Letter, regardless of whether the Commitment herein expires or is terminated.

[SIGNATURE PAGE FOLLOWS]

In witness whereof, the parties have executed this DEBTOR-IN-POSSESSION LOAN AGREEMENT as of the date first written above.

**BORROWER:**

CHIYODA AMERICA, INC.

By: _____

    Name:

    Title:

**LENDER:**

CHIYODA GRAVURE CORPORATION

By: _____

    Name:

    Title:

## Exhibit A

## NOTE

### CHIYODA AMERICA, INC.

$1,675,000

New York, NY

[Date]

FOR VALUE RECEIVED, Chiyoda America, Inc., a corporation organized and existing under the laws of Pennsylvania (the "Borrower"), promises to pay to the order of Chiyoda Gravure Corporation, a corporation organized and existing under the laws of Japan (the "Lender"), the maximum principal amount of one million six hundred seventy five thousand dollars ($1,675,000) or such lesser amount are shall equal as aggregate unpaid principal amount of the Loans made by the Lender in accordance with the provisions of the Loan Agreement dated as of the date hereof between the Borrower and the Lender (such agreement, as it may be amended, supplemented or modified from time to time, the "Loan Agreement").

The Borrower also promises to pay interest on the unpaid principal amount hereof from the date hereof until paid at the rates and at the times as set forth in the Loan Agreement Capitalized terms not otherwise defined herein shall have the same meanings assigned to such terms in the Loan Agreement.

The Lender is hereby authorized to endorse each repayment or prepayment of the principal amount hereof on the schedule that is annexed to and constitutes an integrated part of this Note, which shall constitute prima facie evidence, absent manifest error, of the accuracy of the information contained herein; provided, however, that the failure of the Lender to endorse or record such repayments or prepayments shall not affect the obligation of the Borrower hereunder.

This Note is the Borrower's "Note" issued pursuant and entitled to the benefits of the Loan Agreement to which reference is hereby made for a more complete statement of the terms and conditions under which the Loans evidenced hereby have been made and are to be repaid. The terms and provisions of the Loan Agreement are hereby incorporated and made a part hereof by this reference thereto with the same force and effect as if set forth at length herein.

All payments of principal and interest in respect of this Note shall be made in lawful money of United States in immediately available funds at the office of the Lender as set forth in the Loan Agreement, or at such other place as shall be designated by the Lender in writing for such purpose in accordance with the terms of the Loan Agreement.

The terms of this Note are subject to amendment only in the manner provided in the Loan Agreement.

No reference herein to the Loan Agreement and no provisions of this Note or the Loan Agreement shall alter or impair the obligation of the Borrower, which is absolute and unconditional, to pay the principal of and interest on this Note at the place and at the respective times herein prescribed.

The Borrower promises to pay all costs and expenses, including attorneys' fees, incurred in the collection and enforcement of this Note. The Borrower hereby waives diligence, presentment,

protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

Upon the occurrence of any Event of Default under the Loan Agreement, the principal thereof and accrued interest shall become, or may be declared to be, forcefully due and payable in the manner, upon the conditions and with the effect provided in the Loan Agreement, the Borrower may pre pay all or any part of the principal of the Note before maturity upon the terms provided in the Loan Agreement.

This Note shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York, without regard to its conflicts of laws rules.

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed and delivered by its duly authorized officer, as of the day and year and the place first above written.

### CHIYODA AMERICA, INC.

By:_____

Name:_____

Title:_____

## Schedule A to Note

This Schedule evidences the Loans made under the within-described Note to the Borrower and the payments and prepayments of principal with respect thereto as set forth below.

| Date Made | Principal Payment Dates/Amounts | Amount Paid or Prepaid | Unpaid Principal Amount | Notation Made By |
|-----------|--------------------------------|------------------------|-------------------------|------------------|
|           |                                |                        |                         |                  |

# MORTGAGE AND SECURITY AGREEMENT

THIS Mortgage and Security Agreement is made and entered into as of the _____ day of August    , 2009, by and between Chiyoda America, Inc., a Pennsylvania corporation, having a business address of 708 Third Avenue, 5th Floor, Suite 97, New York, New York 10017 (hereinafter the "Mortgagor"), and Chiyoda Gravure Corporation, a corporation organized under the laws of Japan, having an address of 1-18-16, Osaki, Shinagawa-ku, Tokyo 141-0032 Japan (hereinafter the "Mortgagee").

WHEREAS, Mortgagor borrows from Mortgagee the maximum principal sum of one million six hundred seventy five thousand US dollars (USD1,675,000) ("Principal Sum") pursuant to a DEBTOR-IN-POSSESSION LOAN AGREEMENT made as of August ___, 2009, between Mortgagor and Mortgagee (as amended, modified or restated from time to time, the "Loan Agreement"), which Principal Sum is evidenced by a Promissory Note dated August ___, 2009, payable to the order of Mortgagee in the amount of the Principal Sum (which Promissory Note, together with any extensions, renewals or modifications thereof or substitutions therefor is hereinafter called the "Note"), the Principal Sum and interest thereon to be payable at the time or times, in the manner, and at the rate(s) stated in the Loan Agreement and the Note (the "Loan").

WHEREAS, Mortgagor agreed pursuant to the terms of the Loan Agreement that as a condition to Mortgagee's making of the Loan that Mortgagor would execute and deliver this Mortgage.

WHEREAS, the Mortgagor wishes and intends, by the execution and delivery of this Mortgage, to secure (a) the payment of the principal, interest and other sums due on the Note, this Mortgage, and any other documents executed in connection with the Loan including, without limitation, the Loan Agreement and the Security Agreement made as of August ___, 2009, between Mortgagor and Mortgagee (as amended, modified or restated from time to time, the "Security Agreement") (this Mortgage, the Loan Agreement, the Note, the Security Agreement and all other agreements, documents and instruments delivered to Mortgagee pursuant to or in connection with the transactions contemplated thereby or hereby, the "Loan Documents") and (b) the performance of and compliance with all of the terms, covenants, conditions, stipulations and agreements contained in this Mortgage, the Note, the Loan Agreement, the Security Agreement and all other Loan Documents.

WITNESSETH that, for and in consideration of the Land (defined herein) and of the covenants and agreements made herein, and for a loan in the amount of the Principal Sum and other good and valuable consideration, Mortgagor, INTENDING TO BE LEGALLY BOUND, does hereby grant and convey unto Mortgagee the parcels of property set forth and described on Exhibit A, attached hereto and incorporated herein by reference, located in Caernarvon Township, Berks County, Pennsylvania (the "Land"), also including all improvements ("Improvements") now or hereafter located upon the Land; all easements and appurtenances thereto; all the rights of Mortgagor in and to the streets, alleys and rights-of-way adjoining or adjacent to the Land, together with any and all of the Mortgagor's right, title, interest and claim, either at law or in equity, in or to the Land and Improvements; and all proceeds of the conversion, whether voluntary or involuntary, of any of the hereinafter defined property into cash or other liquid claims,

including, without limitation, all awards, payments or proceeds, including interest thereon, and the right to receive same, which may be made as a result of any casualty, any exercise of the right of eminent domain or deed in lieu thereof, the alteration of the grade of any street and any injury to or decrease in the value of the property. "Improvements" as used herein shall include, but not be limited to (a) any fixtures which would ordinarily be construed as a part of the Land; (b) all machinery, equipment, building materials and other personal property of every nature whatsoever now or hereafter located in or on, or used, or intended to be used, in connection with the ownership or operation of the Land and Improvements; and (c) all buildings and structures of every type now or hereafter located upon the Land.

As further security for the indebtedness hereby secured and the interest thereon, the Mortgagor hereby also does grant and convey unto Mortgagee all leases of any part of the Land and Improvements now or hereafter existing, including all rights of the Mortgagor as lessor thereunder and the rents, issues and income of and from the Land and Improvements accrued and hereafter to accrue, with full power and authority, at Mortgagee's election, to collect and give receipts for the same, to apply all sums so collected, less a reasonable commission thereof, which is hereby authorized to be paid to any agent employed by the Mortgagee to execute the provisions of this paragraph and, after deduction also of expenditures for repairs and upkeep of the Land and Improvements, to the payment of indebtedness described in and secured by this Mortgage. There shall be no duty upon the Mortgagee, however, to exercise such election, and the Mortgagee shall be accountable for only such rents, issues and income actually collected by the Mortgagee. The Mortgagee may permit the Mortgagor at any time and from time to time to collect said rents, issues and income to its own use, in which event the same shall in no way be deemed a waiver by, or to work an estoppel upon, the Mortgagee thereafter to assert Mortgagee's full rights and authority hereunder, provided further, that no prepayment of any of said rents, issues or income for the whole or any portion of the Land and Improvements shall be procured, permitted or valid, without the written consent of the Mortgagee. If, moreover, upon default in the payment of any amount secured by this Mortgage, the Mortgagor or its successors in title to the Land and Improvements shall be or remain in possession thereof, or any part thereof, they shall be obligated to pay the Mortgagee a fair and reasonable rental for the Land so occupied.

All real property, fixtures and personal property described above, including the Land and Improvements, shall be referred to in the aggregate as the "Property."

TO HAVE AND TO HOLD UNTO MORTGAGEE, NEVERTHELESS, to secure for the benefit of Mortgagee (a) the prompt payment of the principal, interest and all other sums due on the Loan Documents; (b) the performance of and compliance with all of the terms, covenants, conditions, stipulations and agreements contained in the Loan Documents; and (c) the payment of all costs and expenses, including reasonable attorneys' fees incurred or paid by the Mortgagee on account of any litigation at law or in equity which may arise in respect of this Mortgage or the Property while this Mortgage continues, and of all monies which may be advanced as herein provided for the protection of the lien and security interest of the Mortgagee in and to the Property, with interest at the interest rate provided in the Note and Loan Agreement on all such costs and sums so advanced from the date of such advance.

Mortgagor shall, at the cost of Mortgagor, and without expense to Mortgagee, execute, acknowledge, deliver and perform all and every such further acts, deeds, conveyances, assignments, notices of assignments, transfers and assurances as Mortgagee shall from time to time require, for the better assuring, conveying, assigning, transferring and confirming unto Mortgagee the Property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which Mortgagor may be or may hereafter become bound to convey or assign to Mortgagee, or for carrying out the intention of the terms of this Mortgage, and, on demand, shall execute and deliver, and hereby irrevocably authorizes Mortgagee to execute in the name of Mortgagor as Mortgagor's attorney-in-fact, to the extent it may lawfully do so, one or more financing statements, chattel mortgages or other security instruments, to evidence more effectively the lien hereof upon the Property.

Mortgagor will not, without the prior written consent of the Mortgagee, permit or suffer to exist any lien or encumbrance on the Property, or any portion thereof, or any legal or equitable interest in, the Property, either inferior or superior in right to the lien of this Mortgage, except for those that have already been disclosed and approved by Mortgagee as Permitted Liens (as defined in the Loan Agreement).

Mortgagor will not, without the prior written consent of Mortgagee, lease, bargain, sell, transfer, assign or convey the Property, or any portion thereof, or any legal or equitable interest in, the Property. If Mortgagor is not a natural person, but a corporation, partnership, trust or other legal entity, then the bargain, sate, transfer or assignment of any stock, partnership interest or any beneficial interest in Mortgagor (including, without limitation, transfers resulting from mergers, consolidations or liquidations) without the prior written consent of Mortgagee shall be deemed to be in contravention of the provisions of the first sentence of this paragraph.

Mortgagor covenants (a) to pay all the taxes and assessments on the Property that arise after the filing of a Chapter 11 Petition by Mortgagor when due and immediately thereafter exhibit the official receipts to Mortgagee; (b) to keep the Land and Improvements insured for such coverage, including fire, with extended coverage, casualty and other such hazards and contingencies, for such amount and with such company or companies, as may be required by or acceptable to Mortgagee, to assign the same with loss payable to Mortgagee, to provide Mortgagee with copies of such policies and receipts evidencing the payment of all premiums due on such policies, to give Mortgagee prompt notice of any loss covered by such insurance, and Mortgagee shall have the right to join Mortgagor in adjusting any loss covered by such policies, and any amount received from said insurance shall be applied in reduction or payment of the indebtedness hereby secured or to the repair or rebuilding of the Improvements, as Mortgagee may direct; (c) to pay promptly any and all sums which have or may at any time hereafter become due for labor and materials furnished in connection with the construction of any Improvements on the Property, and to satisfy forthwith any indebtedness for which a notice of intention to claim mechanics' or materialmen's liens may at any time be filed against the Property. Upon default or neglect in the performance of any of said covenants, Mortgagee may at its option (on ten (10) days' prior written notice to Mortgagor to cure such default) declare the entire indebtedness hereby secured due and payable immediately and may also, but shall not be required to, pay such taxes and assessments; have the Land and Improvements insured; pay and satisfy any debt for labor and materials furnished in connection with the Property; take steps to prevent depreciation or impairment of the

value of the Property; and cure any default under any inferior or superior lien, mortgage or deed of trust. All such expenses shall be secured by this Mortgage, repayable upon demand, and shall bear interest at the default rate provided in the Loan Agreement from the date of any such payment.

The Mortgagor, immediately upon obtaining knowledge of the institution of any proceedings for the condemnation of the Property, or any portion thereof, will notify Mortgagee of the pendency of such proceedings. Mortgagee may participate in any such proceedings, and Mortgagor from time to time will deliver to Mortgagee all instruments to permit such participation. In the event of such condemnation proceedings, the award or compensation payable is hereby assigned and shall be paid to Mortgagee. The proceeds of any award or compensation so received shall, at the option of Mortgagee, either be applied, without premium, to the indebtedness secured by this Mortgage, or be paid over to Mortgagor for restoration and reconstruction of the Property. Mortgagee shall be under no obligation to question the amount in which the same shall be paid. In any such condemnation proceedings, Mortgagee may be represented by counsel selected by Mortgagee, at Mortgagor's sole expense.

Each of the following shall constitute an "Event of Default" under this Mortgage: (a) failure to make any payment when due in accordance with the terms of the Loan Documents, all after the expiration of any applicable grace period, if any; (b) any default in the performance or observance of or under the terms of any warranty, covenant, condition or other provision of the Loan Documents, or in the payment of any other amounts secured by this Mortgage, all after the expiration of any applicable grace period, if any; or (c) the occurrence of any default or event of default under any of the Loan Documents.

Upon occurrence of an Event of Default hereunder, Mortgagee shall have all rights and remedies permitted by applicable law and by any document evidencing or securing the Loan, including, but not limited to, the following:

(a) Mortgagee may take immediate possession of the Property (which Mortgagor agrees to surrender to Mortgagee) and, until a foreclosure sale is made, manage, control and lease the same to such person or persons and at such rental and for such term as Mortgagee may deem proper, and collect all the rents, issues and profits therefrom, including those past due, as well as those thereafter accruing, with the right in Mortgagee to cancel any lease or sublease for any cause or on any ground which would entitle Mortgagor to cancel the same; make such expenditures for maintenance, repairs and costs of operation as it may deem advisable; and after deducting the cost thereof and reasonable compensation for the services of Mortgagee and for all attorneys, agents and other employees by it employed, apply the residue to the payment of any sums which are unpaid hereunder or for the indebtedness secured hereby. Taking possession under this paragraph shall not prevent concurrent or later proceedings for the foreclosure sale of the Property as provided elsewhere herein. Notwithstanding anything herein contained to the contrary, Mortgagee does not assume any obligation to discharge any duty or obligation under any lease nor shall Mortgagee be liable for any acts or failure to act in connection therewith.

(b) Mortgagee may proceed by suit or suits at law or in equity or by any other appropriate remedy to protect and enforce the rights of Mortgagee, or to foreclose the

4

Mortgage, or to sell, as an entity or in several parcels, the Property under the judgment or decree of a court of competent jurisdiction, or otherwise.

(c) Mortgagee may, as a matter of right, without notice to Mortgagor, without regard to the adequacy of the security and whether incidental to a proposed sale of the Property, or otherwise, seek the immediate appointment of a receiver of the Property and of the earnings, revenues, rents and profits thereof and therefrom, with all such powers as the court or courts making such appointment shall confer. Mortgagor hereby consents to such appointment and will, upon Mortgagee's request, formally evidence such consent in writing in any proceeding for the appointment of such receiver.

In the event of a foreclosure sale of the Property, the proceeds of sale shall be applied, unless applicable statutes shall specify otherwise, first, to discharge the expenses of executing this Mortgage, including a commission to Mortgagee of five (5%) percent of the gross proceeds of sale; secondly, to discharge all taxes, levies and assessments, including the Permitted Liens with costs and interest if they have priority over the lien of this Mortgage, including the due pro rata thereof for the current year; thirdly, to discharge, in the order of their priority, if any, the remaining indebtedness and obligations secured by this Mortgage and any liens of record inferior to this Mortgage, with lawful interest; and fourthly, the residue of the proceeds shall be paid to Mortgagor, provided Mortgagee is fully compensated for all losses, costs, fees and expenses related thereto.

Mortgagor agrees, to the extent that Mortgagor may lawfully so agrees that in the case of an Event of Default, as aforesaid, neither Mortgagor nor anyone claiming through or under Mortgagor shall set up, seek or claim to take advantage of any appointment, valuation, stay, extension or redemption laws now or hereafter in force in the locality where the Property may be situated, in order to prevent or hinder the enforcement of foreclosure of this Mortgage, or the absolute sale of the Property, or the final or absolute putting into possession thereof, immediately after such sale, of the purchaser thereof. Mortgagor, for Mortgagor and all who claim through or under Mortgagor, hereby waives, to the fullest extent that Mortgagor may lawfully do so, the benefit of all such laws and any and all right to have the Property marshaled upon any foreclosure of the lien hereof and agrees that Mortgagee or any court having jurisdiction to foreclose such lien may sell the Property as an entirety.

Each right, power and remedy of Mortgagee as provided for in this Mortgage shall be cumulative and concurrent and shall be in addition to every other right, power or remedy it may have, and the exercise or beginning of the exercise by Mortgagee of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by Mortgagee of any or all such other rights, powers or remedies.

PROVIDED ALWAYS, NEVERTHELESS, that if Mortgagor shall pay or cause to be paid to Mortgagee the indebtedness secured hereby, together with interest as herein set forth; shall keep and perform all covenants, conditions and agreements contained in the Loan Documents and in this Mortgage, without fraud or delay, and without any deduction, defalcation or abatement of anything herein mentioned to be paid or done; and shall also pay all satisfaction costs, then this Mortgage and the estate hereby granted, as well as the obligation, shall cease, determine and become void, anything herein contained to the contrary notwithstanding.

A/73111436.1                                                    5

This Mortgage is also a security agreement. To secure the payment of all sums secured by this Mortgage, Mortgagor hereby grants Mortgagee a security interest in all personal property included as part of the Property and all personal property described in any financing statement filed in connection herewith. Mortgagor shall pay all costs of filing such financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all costs and expenses of any record searches for financing statements Mortgagee may reasonable require. Without the prior written consent of Mortgagor shall not create or suffer to be created pursuant to the Pennsylvania Uniform Commercial Code ("UCC") any other security interest in said personal property, including replacements and additions thereto. If an Event of Default occurs under this Mortgage, Mortgagee shall, in addition to all other rights and remedies herein provided, have the right to proceed under the UCC as to all or any part of the personal property and, in conjunction therewith, to exercise all of the rights, remedies and powers of a secured party under the UCC.

Mortgagee shall be protected in acting upon any document believed by it to be genuine and to have been signed by the party or parties purporting to sign the same. Mortgagee shall not be liable for any error of judgment or for any act done or step taken or omitted, or for any mistakes of law or fact, or for anything which Mortgagee may do or refrain from doing in good faith. Mortgagee makes no representations as to the validity, legality or sufficiency of this Mortgage or the Loan Documents, the security hereby or thereby afforded, the title of Mortgagor to the Property or the descriptions thereof, or the filing or recording of this Mortgage or any other document.

Mortgagor shall pay all costs, charges and expenses, including attorneys' fees, costs of suit and evidence of title which Mortgagee may incur in collecting any indebtedness hereby secured or in enforcing any of the rights of Mortgagee hereunder or in protecting the security of Mortgagee, whether by suit or otherwise.

No delay, act or failure to act by Mortgagee, however long continued, shall be construed as a waiver of any of its rights under this Mortgage or any Event of Default.

The nouns, pronouns and verbs used in this Mortgage shall be construed as being of such number and gender as the context may require.

This Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

No modification or waiver of any provision of this Mortgage shall be effective unless such modification or waiver is in writing and signed by Mortgagee, and any such waiver shall be effective only in the specific instance and for the specific purpose for which it is given.

In the event any provision of this Mortgage is held to be invalid, illegal or unenforceable for any reason, then such provision only shall be deemed to be null and void and shall not affect any other provisions of this Mortgage, which shall remain "effective."

All notices and other communications required or permitted to be given shall be in writing and shall be personally delivered, sent by facsimile or by registered or certified mail, postage prepaid, return receipt requested, or by a reputable overnight courier service. Notices that are personally delivered or sent by overnight courier service, or mailed by certified or registered mail,

shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions, notices and other communications shall be given to or made upon the respective parties hereto at their respective addresses (or to their respective facsimile numbers) indicated below or to such other addresses as may be hereafter designated in writing by the respective parties hereto:

If to the Mortgagee:

> Chiyoda Gravure Corporation
> 1-18-16 Osaki, Shinagawa-ku
> Tokyo, Japan
> Atten: Executive Vice President
> Tel. No.: +81 3 3492 5311
> Facsimile No.: +81 3 3492 5314

If to the Mortgagor:

> Chiyoda America Inc.
> 708 Third Avenue
> 5th Floor - Suite 97
> New York, NY 10017
> Attn: Vice President

IN WITNESS WHEREOF, Mortgagor has executed this Mortgage and Security Agreement under seal the day and year first above written.

WITNESS:                         MORTGAGOR:

Chiyoda America, Inc.

_____          By:_____
                                 Name:_____
                                 Title:_____

COMMONWEALTH OF PENNSYLVANIA:
                                                  : SS.:

COUNTY OF

      On this, the ___ day of _____, 20__, before me, a Notary Public, the undersigned officer, personally appeared _____, who acknowledged himself to be the _____ of Chiyoda America, Inc., a Pennsylvania corporation, and that he, as such, being authorized to do so, executed the foregoing Mortgage for the purpose therein contained by signing the name of the company by himself as _____.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public
My Commission Expires:
(SEAL)

      The address of the within Mortgagor is _____.

## EXHIBIT A

### Parcel 1

ALL THAT CERTAIN lot or piece of ground with buildings and improvements thereon erected, situate in the Township of Caernarvon, County of Berks, Commonwealth of Pennsylvania bounded and described according to a Final Plan of Thousand Oaks Corporate Center made by Chester Valley Engineers, Inc. dated 4/7/1986, last revised 2/24/1989 and recorded at Berks County Plan Book 163 page 30, as follows, to wit:

BEGINNING at a point on the Southwest side of Tree Drive, 56 feet wide, said point being measured on the arc of a circle curving to the right having a radius of 20.00 feet the arc distance of 31.42 feet from a point of curve on the Southeast side of Thousand Oaks Boulevard, 53 feet wide; thence from said beginning point and along said Tree Drive, South 51 degrees 53 minutes 45 seconds East 230.00 feet to a point at corner of Lot #8 of said Plan; thence along the same South 38 degrees 06 minutes 15 seconds West 426.78 feet to a point in line of Lot #6 of said Plan; thence along the same North 44 degrees 37 minutes 00 seconds West 252.54 feet to a point of curve on the Southeast side of said Thousand Oakes Boulevard; thence along the same the two (2) following courses and distances: (1) on the arc of a circle curving to the left having a radius of 726.50 feet the arc distance of 27.07 feet to a point of curve; thence extending on the arc of a circle curving to the right having a radius of 20.00 feet the arc distance of 31.42 feet to the first mentioned point and place of BEGINNING.

BEING Lot #7 of the above-mentioned plan.

### Parcel 2

ALL THAT CERTAIN lot or parcel of land, together with the improvements thereon erected, situate in the Township of Caernarvon, County of Berks, Commonwealth of Pennsylvania, being Lot No. 9 as shown on a revision to the final plan of "Thousand Oaks Corporation Center," recorded on Plan Book Volume 163, Page 30, Berks County records, and being more fully bounded and described as follows, to wit:

BEGINNING at a point on the Northeasterly right-of-way line of Thousand Oaks Boulevard (53 feet wide) said point being a corner in common with Lot No. 10 of said plan; thence leaving the Northeasterly right-of-way line of Thousand Oaks Boulevard and extending along said Lot No. 10 North 52 degrees 03 minutes 22 seconds East, a distance of 437.67 feet to a corner marked by a steel pin near the edge of Conestoga Creek; thence extending along the property now or late of Walter McElroy and Esther K. McElroy, husband and wife, North 42 degrees 59 minutes 27 seconds East, a distance of 54.46 feet to a corner marked by a steel pin; thence extending along property now or late of Lawrence L. Bright and Dianna D. Bright, husband and wife, the two (2) following courses and distance to wit: (1) South 15 degrees 20 minutes 33 seconds East, a distance of 311.85 feet to a corner marked by a planted stone, and (2) South 18 degrees 05 minutes 33 seconds East; a distance of 677.35 feet to a corner marked by a steel pin; thence extending along the property now or late of Peter N. Skiadas and Harry Keares, the two (2) following courses and distances, to wit: (1) South 47 degrees 51 minutes 39 seconds West, a distance of 108.35 feet to a corner marked by a drill hole on rock, and (2) South 67 degrees 07 minutes 10 seconds West, a

A/73111436.1

distance of 56.02 feet to a point, a corner in common with Lot No. 8 of said plan; thence extending along said Lot No. 8, North 66 degrees 26 minutes 12 seconds West, a distance of 398.77 feet to a point on the curve in the right-of-way line of the cul-de-sac at the terminus of Oak Tree Drive (60.00 feet radius); thence extending along the right-of-way line of Oak Tree Drive in a Northwesterly direction along the arc of a curve deflecting to the left having a radius of 60.00 feet, a central angle of 121 degrees 23 minutes 45 seconds, a distance along the arc of 127.13 feet to a point of reverse curvatures, thence continuing along said right-of-way line in a Northwesterly direction along the arc of a curve deflecting to the right, having a radius of 50.00 feet, a central angle of 45 degrees 56 minutes 12 seconds, a distance along the arc of 40.09 feet to a point on the Northeasterly right-of-way line of said Oak Tree Drive (53 feet wide); thence continuing along said right-of-way line of North 51 degrees 53 minutes 45 seconds West, a distance of 239.45 feet to a point of curve, said curve connecting the said Northeasterly right-of-way line of Oak Tree Drive with the Southeasterly right-of-way line of the aforementioned Thousand Oaks Boulevard; thence extending in a Northwesterly and Northeasterly direction along the arc of said curve deflecting to the right, having a radius of 20.00 feet, a central angle of 90 degrees 00 minutes 00 seconds, a distance along the arc of 31.42 feet to a point on the Southeasterly right-of-way line of Thousand Oaks Boulevard; thence extending along said right-of-way line, North 38 degrees 06 minutes 15 seconds East, a distance of 128.50 feet to a point of curve; thence continuing in a Northeasterly direction along the Southeasterly and Northeasterly right-of-way line of Thousand Oaks Boulevard, along the arc of a curve deflecting to the left, having a radius of 176.50 feet, a central angle of 66 degrees 55 minutes 19 seconds, a distance along the arc of 206.15 feet to the point or place of BEGINNING.

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (as amended, modified or supplemented from time to time, this "Agreement") is entered into as of August __, 2009, between Chiyoda America, Inc., a Pennsylvania corporation (the "Grantor"), and Chiyoda Gravure Corporation, a Japanese corporation (the "Secured Party").

## RECITALS

**WHEREAS**, the Secured Party has agreed to make certain credit to the Grantor (the "Loan") pursuant to, and subject to the terms and provisions of the DEBTOR-IN-POSESSION LOAN AGREEMENT as of the date hereof between the Grantor as the borrower and the Secured Party as the lender (as such agreement may from time to time be amended, modified or supplemented, the "Loan Agreement").

**WHEREAS**, in consideration of the Secured Party's entering into the Loan Agreement and to the continuation of the Loan in accordance with the terms thereof, the Grantor is willing to grant the Secured Party a security interest in all of the Grantor's business assets.

**WHEREAS**, the Secured Party has conditioned its willingness to continue the Loan in accordance with the terms of the Loan Agreement on, among other things, the execution of this Agreement by the Grantor.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce the Secured Party to continue the Loan to the Grantor in accordance with the terms of the Loan Agreement, the Grantor hereby agrees as follows:

## ARTICLE 1

## DEFINITIONS

**SECTION 1.1. Definitions**. Capitalized terms used in this Agreement shall have the following meanings, unless otherwise expressly provided herein:

"Accounts" means all Accounts of the Grantor including, without limitation, all present and future accounts, accounts receivable and other rights of the Grantor to payment for goods sold or leased or for services rendered.

"Agreement" has the meaning assigned to such term in the preamble to this Agreement.

"Chattel Paper" has the meaning assigned to such term in the UCC.

"Collateral" has the meaning assigned to such term in Section 2.1(a).

"Deposit Accounts" has the meaning assigned to such term in the UCC.

"Documents" means a document of title or a receipt issued by the owner of goods stored under a statute requiring a bond against withdrawal or a license for the issuance of receipts in the nature of warehouse receipts.

"Equipment" means all Equipment of the Grantor including, without limitation, all (i), machinery, (ii) manufacturing, distribution, selling, data processing and office equipment, (iii) furniture, furnishings, appliances, fixtures and trade fixtures, tools, tooling, molds, dies, vehicles, vessels, trucks, buses and motor vehicles, (iv) all parts thereof and all accessions, additions, attachments, improvements, substitutions and replacements thereto, (v) all software or computer programs embedded in such equipment and supporting information related to such computer programs, and (vi) other goods of every type and description (other than inventory) in each case, whether now owned or hereafter acquired.

"Event of Default" has the meaning assigned to such term in Section 5.1.

"General Intangibles" means all General Intangibles of the Grantor including, without limitation, all (i) goodwill, (ii) service marks, trade secrets, copyrights, copyright applications, trademarks, trademark applications, trade names, patents, patent applications, and all registrations and applications therefor, together with the good will related thereto, (iii) proceeds of insurance policies, (iv) all licenses, permits and agreements of any kind pursuant to which the Grantor possesses, or is authorized to possess or use the property (whether tangible or intangible) of others or others possess, use or are authorized to possess or use the property (whether tangible or intangible) of the Grantor, and (v) other contract rights.

"Indemnified Liabilities" has the meaning assigned to such term in Section 7.1.

"Indemnified Parties" has the meaning assigned to such term in Section 7.1.

"Instruments" has the meaning assigned to such term in the UCC.

"Inventory" means all Inventory of the Grantor, including, without limitation, all inventory now owned or hereafter acquired by the Grantor (wherever located, whether in the possession of the Grantor or of a bailee or other Person for storage, sale, transit, processing, use or otherwise and whether consisting of whole goods, spare parts, components, supplies, materials, or consigned, returned or repossessed goods) that are held for sale or lease, which are to be furnished (or have been furnished) under any contract of service or that are raw materials, work in process or materials used or consumed in the Grantor's businesses.

"Investment Property" has the meaning assigned to such term in the UCC.

"Letter-of-Credit Rights" has the meaning assigned to such term in the UCC.

"Lien" means any mortgage, lien, charge or encumbrance on, or security interest in, or pledge or deposit of, or right of a vendor under any conditional sale or other title retention agreement with respect to, any property or asset of any Person that secures indebtedness of such Person or any other Person.

"Loan Agreement" has the meaning assigned to such term in the first recital to this Agreement.

"Loan Document" has the meaning assigned to such term in the Loan Agreement.

"Obligations" means:

(a) Any and all indebtedness or liabilities, of whatever kind, nature and description, arising, due or to become due, of the Grantor to the Secured Party, whether direct or indirect, primary or secondary, secured or unsecured (including overdrafts), absolute or contingent, joint or several, arising out of or relating to the Loan Agreement, and

(b) Any and all liabilities of the Grantor incurred under this Agreement.

"Permitted Lien" has the meaning assigned to such term in the Loan Agreement.

"Person" means the Grantor or any other corporation, limited liability company, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, or other organization, whether or not a legal entity.

"Proceeds" means any and all proceeds of any of the Collateral including, without limitation, (i) any and all proceeds and products of the Collateral, all additions and accessions to the Collateral, and all property received wholly or partly in trade or exchange for the Collateral, (ii) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Secured Party or the Grantor from time to time with respect to any of the Collateral, and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Records" means all of Grantor's books of accounts, ledgers, computer software, computer printouts and other computerized records and cabinets in which there are reflected or maintained the Accounts, Inventory, Equipment, General Intangibles, Deposit Accounts, Letter of Credit Rights, Chattel Paper, leases, Documents and Instruments or Investment Property in which Secured Party has a security interest, or which relate to any other security Secured Party may hold from Grantor and all supporting evidence and documents relating to such security in the form of written applications, credit information, account cards, payment records, correspondence, delivery and installation certificates, invoice copies, delivery receipts, notes and other evidences of indebtedness, insurance certificates and the like.

"Supporting Obligation" has the meaning assigned to such term in the UCC.

"UCC" means the Uniform Commercial Code as adopted and amended from time to time in Pennsylvania or in any other applicable jurisdiction.

**SECTION 1.2. UCC Definitions**. Unless otherwise defined herein, terms used in this Agreement for which meanings are provided in the UCC, shall be deemed to have the meanings provided for in the UCC; provided, however, that capitalized terms defined in or by reference in the preceding Section 1.1, shall have the meanings specified therein.

**SECTION 1.3. Rules of Interpretation.** All terms defined in or by reference in Section 1.1 in the singular shall have the same meanings when used in the plural and vice versa. Each reference to a document or agreement in this Agreement shall refer to such document or agreement as amended, waived, supplemented or otherwise modified from time to time in accordance with the applicable provisions hereof or thereof, as the case may be. Each reference to a Person in this Agreement shall refer to such Person and the permitted successors and assigns of such Person. Unless otherwise specified, all references to sections or articles in this Agreement shall refer to the relevant section or article of this Agreement.

## ARTICLE 2

## GRANT OF SECURITY INTEREST

### SECTION 2.1. Grant of Security Interest.

(a)     To secure the prompt and complete payment, performance and observance when due (whether at the stated maturity, by acceleration or otherwise) of all of the Obligations, the Grantor hereby assigns and pledges to the Secured Party and hereby grants to the Secured Party a first priority continuing security interest in all of its personal property and assets, including but not limited to all of its right, title and interest, now owned or at any time hereafter acquired in and to the following (collectively, the "Collateral"): (i) Accounts; (ii) Inventory; (iii) Equipment; (iv) General Intangibles; (v) Chattel Paper; (vi) Documents; (vii) Instruments; (viii) Deposit Accounts; (ix) Letter-of-Credit Rights; (x) Investment Property; (xi) Records; (xii) Proceeds; and (xiii) Supporting Obligations, provided, however, the security interests granted to the Secured Party pursuant to this Agreement shall subordinate to the Permitted Lien except for the Liens for the Class 3 CGC Loan as defined in the Plan. The Collateral referenced herein shall exclude a lien on any and all avoidance action under Chapter 5 of the United States Bankruptcy Code.

(b)     Grantor Remains Liable. The grant of the security interest pursuant to this Section 2.1 and the exercise by the Secured Party of any of its rights under this Agreement shall not:

(i)     relieve the Grantor from the performance of any term, covenant, condition or agreement on the Grantor's part to be performed or observed under or in connection with the Collateral;

(ii)     impose any obligation on the Secured Party to perform or observe any such term, covenant, condition or agreement on the Grantor's part to be so performed or observed; or

(iii)     impose any liability on the Secured Party for any act or omission on the part of the Grantor, or any Person acting as agent for or on behalf of the Grantor, or for any breach of any representation or warranty on the part of the Grantor in connection with the Collateral.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

**SECTION 3.1. Grantor's Representations and Warranties**. In addition to any representations and warranties of the Grantor contained in the Loan Documents, the Grantor hereby represents and warrants to the Secured Party as follows:

(a) Ownership of Collateral. The Grantor is the Owner of all of the Collateral free and clear of any Lien or other right, title or interest of any Person, other than Permitted Liens. No effective financing statement (or similar statements or instrument of registration under the law of any applicable jurisdiction) is now on file (other than those filed in favor of the Secured Party in connection with this Agreement) or of record in any public office covering or purporting to cover any interest of any kind in any of the Collateral.

(b) Necessary Filings. All filings, registrations and recordings necessary or appropriate to create, preserve, protect and perfect the security interests granted by the Grantor to the Secured Party pursuant to this Agreement have been accomplished and the security interests granted to the Secured Party pursuant to this Agreement in and to the Collateral constitute perfected first priority security interests therein.

(c) Grantor Names. The Grantor's exact legal name as it appears in its articles of organization is Chiyoda America Inc. The Grantor does not do business nor has it in the past five years done business under any name other than Chiyoda America, Inc. or Cosmopolitan Graphics Corporation. Grantor is a Pennsylvania corporation.

(d) Location of Certain Collateral and Records. The originals of all documents evidencing Accounts and the original books of account and records relating thereto, and all books and records relating to all other Collateral, are kept at the address specified in Section 3.1(d) above. All tangible Collateral (other than inventory in transit or in public warehouses as to which the Grantor has delivered appropriate warehouse receipts) are kept or located at the Grantor's premises located at the locations described in Schedule 1.

## ARTICLE 4

## COVENANTS

**SECTION 4.1. Grantor Covenants**. The Grantor covenants and agrees with the Secured Party that until all Obligations shall have been paid or satisfied in full:

(a) Sale and Use of Collateral. The Grantor shall not sell, offer to sell, assign, lease, rent, license, or otherwise transfer or dispose of any Collateral or any interest therein, except for sales of inventory and licenses of general intangibles in the ordinary course of business.

(b) Liens and Consignment. The Grantor shall not create, incur, assume or permit to exist any Lien, other than Permitted Liens, on or in respect of any Collateral or any part

thereon or any interest therein. The Grantor shall not consign all or any portion of its Inventory to any Person unless the Secured Party agrees in writing prior to such consignment.

(c)     Financing Statements. The Grantor shall not execute or authorize to be filed (except in connection with this Agreement) or registered in any public office any financing statement (or similar statement or instrument of registration under the law of any jurisdiction) covering or purporting to cover any interest of any kind in the Collateral.

(d)     Business Names. The Grantor shall not change its name without providing at least 30 days' prior written notice to the Secured Party, which notice shall set forth such new name and such other information in connection therewith as the Secured Party shall reasonably request

(e)     Accounts. The originals of all documents evidencing Accounts and all of the books and records relating thereto, and all books and records related to all other Collateral, shall be kept at the Grantor's office specified in Section 3.1(e).

(f)     Modification of Terms of Accounts. The Grantor shall not rescind or cancel any indebtedness evidenced by any Accounts or modify any term thereof or make any adjustment with respect thereto, or extend or renew the same, or compromise or settle any dispute, claim, suit or legal proceedings relating thereto, or sell any Accounts or interest therein except for returns, discounts and allowances in the ordinary course of business, without the prior written consent of the Secured Party. The Grantor shall duly fulfill all obligations on its part to be fulfilled under or in connection with the Accounts and shall take no action that could impair the rights of the Secured Party in the Accounts.

(g)     Collection of Accounts. The Grantor shall endeavor to collect from the account obligor of each of its Accounts, as and when due (including, without limitation, Accounts which are delinquent) any and all amounts owing under or on account of such Accounts, and apply immediately upon receipt thereof all such amounts so collected to the outstanding balance of such Accounts.

(h)     Location of Tangible Collateral and Records. All tangible Collateral (other than Inventory in transit or in public warehouses as to which the Grantor has delivered appropriate warehouse receipts) will be kept or located at the Grantor's premises specified in Schedule 1 or at such new locations as the Grantor may establish after providing not less than 30 days' prior written notice to the Secured Parry of its intention to establish such new location.

(i)     Maintenance of Collateral. The Grantor shall maintain, preserve and protect all tangible Collateral in saleable condition and in good repair, working order and condition (ordinary wear excepted), shall not use the Collateral in any manner outside the ordinary course of its business or in violation of any applicable law or policy of insurance thereon and, as quickly as practicable after the occurrence of any loss or damage to such tangible collateral, make or cause to be made all necessary repairs, replacements and other improvements in connection therewith and promptly furnish the Secured Party with a written notice. The Grantor shall notify the Secured Party of any material loss or depreciation in the value of any Collateral.

A/73111362.1      6

(j)    Taxes. The Grantor shall promptly report, pay and discharge, or cause to be reported, paid and discharged, all license and registration fees and all taxes, assessments, levies, or charges of any nature whatsoever imposed, levied or assessed against any Collateral together with any penalties or interest thereon, by any applicable federal, state or local governmental or taxing authority except to the extent the validity thereof is being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with generally accepted accounting principles have been set aside.

(k)    Books and Records; Inspection. Inspection The Grantor shall permit officers and designated representatives of the Secured Party to visit and inspect any of the properties of the Grantor, to examine the books of record and account (whether written or electronic) of the Grantor, and to discuss the affairs, finances and accounts of the Grantor with the Grantor's officers, employees and consultants, all at the Grantor's own cost and expense, upon reasonable advance notice to the Grantor.

(l)    Insurance. The Grantor shall keep the Collateral at all times insured with responsible and reputable insurance companies against risks of loss or damage by fire (including so-called extended coverage), theft, and such other casualties and in such amounts, under such forms of policies, upon such terms and for such periods as are usually maintained by other Persons engaged in similar businesses and owning similar properties in the same general areas in which the Grantor operates or as otherwise may be required by the Secured Party. Each such policy shall name the Secured Party as loss payee and additional insured and provide that at least 30 days' prior written notice of cancellation or of lapse shall be given to the secured party by the insurer. At the request of the Secured Party, the Grantor shall furnish the Secured Parry with certificates of insurance or such other evidence satisfactory to the Secured Party so as to evidence compliance with the provisions of this Section 4.1(l).

(m)    Investment Property. Upon acquiring or holding any certificated securities, the Grantor shall immediately notify the Secured Party thereof and, at the Secured Party's request, endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify. If any uncertificated securities now or hereafter acquired by the Grantor are issued to the Grantor or its nominee directly by the issuer thereof, the Grantor shall immediately notify the Secured Party thereof and, at the Secured Party's request, take such actions as the Secured Party may request to cause the Secured Party's security interest therein to be perfected.

(n)    Deposit Accounts. At the request of the Secured Party, the Grantor shall take such actions as the Secured Party may request to cause the Secured Party's security interest in any Deposit Account to be perfected, including, without limitation, entering into a control agreement in form and substance satisfactory to the Secured Party with respect to each Deposit Account.

(o)    Execution of Other Documents. The Grantor authorizes the Secured Party to file from time to time any financing statement relating to the Collateral that the Secured Party deems necessary to create or to maintain a perfected first priority security interest in the Collateral. The Grantor shall, at its own expense, make, execute, endorse, acknowledge, file and deliver to the Secured Party from time to time such financing statements, lists, descriptions and designations of

A/73111362.1                                                                                              7

its Collateral or other instruments and take such further steps relating to the Collateral, which the Secured Party may reasonably request, in a form satisfactory to the Secured Party, to create, preserve, protect and perfect the security interests and the priority thereof granted by the Grantor to the Secured Party in and to the Collateral. The Grantor shall pay any applicable filing fees and related expenses.

## ARTICLE 5

## EVENTS OF DEFAULT

**SECTION 5.1. Events of Default.** The Grantor shall be in default under this Agreement and an Event of Default (an "Event of Default") shall exist hereunder upon the occurrence of any of the following events or conditions:

(a) An Event of Default (as defined in the Loan Agreement) shall have occurred and be continuing;

(b) Any representation, warranty or statement made herein or in connection herewith shall prove to have been false or misleading in any material respect when made or furnished;

(c) The Grantor shall breach any covenant or agreement made herein;

(d) The Secured Party fails to have a first-priority security interest in the Collateral except for Permitted Liens;

(e) Any provision of this Agreement shall for any reason cease to be valid and binding on or enforceable against the Grantor, as a consequence of which the rights of the Secured Party would be materially and adversely affected in the reasonable judgment of the Secured Party;

(f) Other than with respect to Permitted Liens, a notice of lien, levy or assessment is filed of record with respect to all or any part of the Collateral by any Person other than the Secured Party.

## ARTICLE 6

## REMEDIES

### SECTION 6.1. Remedies.

(a) Generally. If any Event of Default shall have occurred and be continuing the Secured Party shall have, in addition to any other rights and remedies provided for in the Loan Agreement or any other Loan Document, all of the rights and remedies of a secured party under the UCC. Without limiting the generality of the foregoing, upon the occurrence of an Event of Default, the Secured Party shall have in addition to all other rights and remedies available in any relevant jurisdiction, the following rights and remedies upon the occurrence of an Event of Default.

(i) The Secured Party shall be entitled to take possession of and prepare the Collateral for sale until the Collateral is disposed of, or may propose to retain the Collateral in satisfaction of the Obligations.

(ii) The Secured Party may require the Grantor to assemble all or any part of the Collateral and make the Collateral available for possession at any place or places to be designated by the Secured Party in its reasonable discretion.

(iii) The Secured Party may require the Grantor to deliver to the Secured Party, or, at the Secured Party's option, to deposit in one or more special collateral accounts maintained for the Secured Party, all collections on Accounts, and other rights to payment constituting Collateral, and all other cash Proceeds, immediately upon receipt thereof, in the form received, except for the Grantor's endorsement when necessary. Until delivered to the Secured Party or deposited in a collateral account, all such Proceeds shall be held in trust by the Grantor for and as property of the Secured Party and shall not be commingled with any funds or property of the Grantor.

(iv) The Secured Party shall have the right to enter upon the premises of the Grantor without any obligation to pay rent to the Grantor, or any other place or places where the Collateral is located and kept, or to remove the Collateral therefrom to the premises of the Secured Party, or any of its agents, for such time as the Secured Party may desire, in order to effectively collect or liquidate the Collateral.

(v) Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Secured Party shall give at least ten days prior written notice to the Grantor of the time and place of any public sale thereof or of the time after which any private sale or other intended disposition thereof is to be made. The Grantor acknowledges and agrees that ten days prior written notice of such sale or sales shall constitute reasonable notice.

(vi) The Secured Parry may buy the Collateral or any part thereof at any public sale, and, if the Collateral is of a type customarily sold on a recognized market or is of a type which is subject to widely distributed standard price quotations, the Secured Party may buy at a private sale. The net proceeds realized upon any such disposition of the Collateral, after deduction for the expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like, and the reasonable attorney's fees and legal expenses incurred by the Secured Party in connection therewith, shall be applied in satisfaction of the Obligations in such order as the Secured Party in its sole discretion may elect. The Secured Party shall account to the Grantor for any surplus realized on such disposition and the Grantor shall remain liable for any deficiency.

(b) Special Remedies as to Accounts. In addition to the other rights and remedies of a secured party under the UCC, with respect to any Accounts, upon the occurrence of any Event of Default, the Secured Party shall have the right, but not the obligation, in the name of the Grantor, or otherwise: (i) to ask for, demand, collect and receive the Accounts or any part thereof; (ii) to extend the time of payment of, compromise or settle for cash, credit or otherwise, and upon any terms and conditions, any of the Accounts; (iii) to endorse the name of the Grantor on any checks, drafts or other orders or instruments for the payment of moneys payable to the

Grantor that shall be issued in respect of any Account; (iv) to file any claims, commence, maintain or discontinue any actions, suits or other proceedings deemed by the Secured Party as necessary or advisable for the purpose of collecting or enforcing payment of any Account; (v) to notify any or all account parties under any or all of the Accounts to make payment thereof directly to the Secured Party for the account of the Secured Party and to require the Grantor to immediately give similar notice to any account party; (vi) to require the Grantor to immediately account for and transmit to the Secured Party, in the same form as received, all proceeds (other than physical property) of collection of Accounts received by the Grantor and, until so transmitted, to hold the same in trust for the Secured Party without commingling such proceeds with any other funds of the Grantor, and (vii) to execute any instrument and do any and all other things necessary and proper to protect and preserve and realize upon the Accounts and the other rights contemplated hereby. The Grantor hereby agrees that all of the foregoing may be effected without demand or advertisement (except as required by law), all of which (to the extent permitted by law) are hereby expressly waived. The Secured Party shall not be obligated to do any of the acts hereinabove authorized, but in the event that the Secured Party elects to do any such act, it shall not be responsible to the Grantor therefor except for its gross negligence or willful misconduct.

(c)     Expenses.  Any and all expenses of the Secured Party incurred in the taking, holding, preparing for sale and selling of the Collateral, including the Secured Party's reasonable attorney's fees and legal expenses, shall become additional Obligations of the Grantor, payable on demand and secured by the Collateral.

(d)     Cumulative Remedies/No Waiver.  The remedies of the Secured Party hereunder are cumulative and the exercise of any one or more of the remedies provided for herein or under the UCC shall not be construed as a waiver of any of the other remedies of the Secured Party (including the equitable right of set-off), so long as any part of the Obligations shall remain unsatisfied.

## ARTICLE 7

### INDEMNIFICATION

**SECTION 7.1. Indemnity**.  The Grantor hereby agrees to indemnify, pay and hold the Secured Party and its officers, directors, employees, agents, representatives and affiliates (collectively, the "Indemnified Parties") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnified Parties in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Parties are designated parties thereto ) that may be imposed on, incurred by, or asserted against the Indemnified Parties, in any manner relating to or arising out of this Agreement, the Loan Agreement, any other Loan Document or any other agreement or document executed and delivered by the Grantor in connection herewith or therewith (the "Indemnified Liabilities"); provided, however that the Grantor shall have no obligation to an Indemnified Party hereunder with respect to Indemnified Liabilities arising from the gross negligence or willful misconduct of such Indemnified Party.

**SECTION 7.2. Liens**. Without limiting the generality of the foregoing, the Grantor agrees to pay or reimburse the Secured Party for any and all fees, costs and expenses of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel) incurred in connection with the creation, preservation or protection of the Secured Party's liens on, and security interest in, the Collateral, including, without limitation, all fees and taxes in connection with the recording or filing of instruments and documents in public offices and all other fees, costs and expenses in connection with protecting, maintaining or preserving the Collateral and the Secured Party's interest therein, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions, suits or proceedings arising out of or relating to the Collateral.

**SECTION 7.3. Indemnity Obligation Secured by Collateral**. Any amounts paid by any Indemnified Party hereunder as to which such Indemnified Party has the right to reimbursement shall constitute Obligations secured by the Collateral.

**SECTION 7.4. Survival**. The provisions of this Article 7 shall survive the termination of this Agreement and the discharge of the other Obligations; provided, however, that upon the discharge of all other Obligations, the Liens shall be deemed released and discharged.

## ARTICLE 8

### MISCELLANEOUS

**SECTION 8.1. Waiver**. No failure or delay on the part of the Secured Party in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by the Secured Party of any right, power or remedy preclude the further exercise thereof or the exercise of any other right, power or remedy.

**SECTION 8.2. Benefit**. This Agreement shall be binding upon, and inure to the benefit of, the Grantor, the Secured Party and their respective successors and assigns; provided, however, that the Grantor may not assign its rights or obligations hereunder or in connection herewith or any interest herein (voluntarily, by operation of law or otherwise) without the prior written consent of the Secured Party and any such assignment without such consent shall be void.

**SECTION 8.3. Marshalling**. The Secured Party shall not be required to marshal any present or future collateral security (including but not limited to this Agreement and the Collateral) for, or other assurances of payment of the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other rights, however existing or arising, may be exercised in any order.

### SECTION 8.4. Governing Law; Waiver of Jury Trial

(a) This Agreement shall be governed by and construed in accordance with the laws of Pennsylvania, without regard to its internal rules concerning the conflict of laws, except for the perfection and enforcement of security interests and licenses in other jurisdictions, which shall be governed by the laws of those jurisdictions.

(b) THE GRANTOR HEREBY IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING (i) TO ENFORCE OR DEFEND ANY RIGHTS UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR (ii) ARISING FROM ANY DISPUTE OR CONTROVERSY IN CONNECTION WITH OR RELATED TO THIS AGREEMENT OR ANY SUCH AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

(c) THE GRANTOR IRREVOCABLY AGREES THAT ANY ACTION OR PROCEEDING IN ANY WAY, MANNER OR RESPECT ARISING OUT OF THIS AGREEMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY DISPUTE OR CONTROVERSY ARISING IN CONNECTION WITH OR RELATED TO THIS AGREEMENT OR ANY SUCH AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT MAY BE LITIGATED IN THE COURTS HAVING SITUS WITHIN PENNSYLVANIA, AND THE GRANTOR HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED WITHIN SUCH STATE. THE GRANTOR HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST THE GRANTOR BY THE SECURED PARTY IN ACCORDANCE WITH THIS SECTION 8.4(c).

**SECTION 8.5. Severability**. Each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be ineffective or invalid, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**SECTION 8.6. Headings.** Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**SECTION 8.7. Jurisdiction.** Notwithstanding any provision in this Agreement to the contrary, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") shall have jurisdiction over any dispute, claim or controversy arising out of or related to this Agreement, provided, however, to the extent that the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction with respect to the matter in question, the United States District Court for the Southern District of New York and the state courts sitting in the New York county shall have jurisdiction over any dispute, claim or controversy arising out of or related to this Agreement.

**SECTION 8.8. Amendments**. No amendment, modification, supplement, termination or waiver of or to any provision of this Agreement, nor consent to any departure by the Grantor from the terms of any provision of this Agreement, shall be effective unless the same shall be in writing and signed by or on behalf of the Secured Party.

A/73111362.1                                                                                         12

**SECTION 8.9. Notices.** All notices, requests and other communications to any party hereto shall be in writing (including facsimile or similar writing) and shall be given to such party, addressed to it at its address as set forth in the Loan Agreement or such other address or as such party may hereafter specify for the purpose of notice to the other party.

**SECTION 8.10. Effectiveness; Counterparts.** The Grantor and the Secured Party may sign this Agreement in counterparts. Delivery of an executed signature page to this Agreement by facsimile or other electronic means shall be as effective as delivery of a manually signed counterpart of this Agreement.

**SECTION 8.11. Term.** This Agreement shall remain in full force and effect until indefeasible payment and satisfaction in full of all of the Obligations and the termination of the Loan Documents.

**IN WITNESS WHEREOF**, the undersigned have executed and delivered this Agreement as of the date first written above.

Grantor: **CHIYODA AMERICA, INC.**

By:_____
Name:_____
Title:_____

Secured Party: **CHIYODA GRAVURE CORPORATION**

By:_____
Name:_____
Title:_____

Collateral locations

(1) All Collateral are located in the following locations except for Deposit Accounts.

| | |
|---|---|
| Chiyoda America Inc.<br>378 Thousand Oaks Blvd.<br>Thousand Oaks Corporate Center<br>Morgantown, Pennsylvania 19543 | Chiyoda America Inc.<br>708 Third Avenue<br>5th Floor - Suite 97<br>New York, NY 10017 |

(2) Deposit Accounts

     (i)     Wachovia Bank
            Commercial Money Market Account
            Account No.: 2000018312225
            800-566-3862

     (ii)    Wachovia Bank
            Commercial Checking Account
            Account No.: 2000812447820
            800-566-3862